[No. B119652. Second Dist., Div. Three. May 21, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL R. GOMEZ, Defendant and Appellant.

## Counsel

Michael T. Shannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Mary Sanchez and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

### KITCHING, J.—

#### INTRODUCTION

In this case, we decide expert testimony regarding battered women's syndrome is not relevant unless there is sufficient factual evidence that the victim is a battered woman.

A jury found Daniel R. Gomez (Gomez) guilty of assault with a deadly weapon and by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)),[1] during the commission of which he personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (d)), misdemeanor battery of a cohabitant (§ 243, subd. (e)), and misdemeanor assault (§ 240). The jury found Gomez not guilty of willfully inflicting corporal injury on a cohabitant (§ 273.5). In a bifurcated proceeding, the trial court found true allegations Gomez previously had been convicted of four serious or violent felonies within the meaning of the "Three Strikes" law (§ 667, subds. (b)-(i)). The trial court sentenced Gomez to 25 years to life in prison. He timely filed a notice of appeal.

Gomez contends the trial court erred when it allowed the prosecutor to present expert testimony regarding battered women's syndrome. He argues this expert testimony was irrelevant because no evidence showed the victim in this case was a battered woman. He further asserts the evidence was highly prejudicial and its admission requires reversal of his convictions. We agree and reverse the judgment.

---

[1] All future references to code sections are to the Penal Code unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

1. *The Prosecution's Case*

    a. *Testimony of Vanessa De La Nunez.*

In April of 1997, Vanessa De La Nunez (De La Nunez) and Gomez were living together as boyfriend and girlfriend, as they had done for approximately 13 months. De La Nunez worked at a dental office. On the morning of Wednesday, April 9, she was running late and had not stopped to prepare liver for their pit bull. Gomez, who had taken a day off from his work, was "bothered." He was unhappy because he and De La Nunez had a number of engagements they were going to have to break because she had decided to go to work that day. After complaining that De La Nunez was not doing her job, Gomez started to cook the liver himself. Gomez and De La Nunez exchanged words, then started to argue. After they had argued for several minutes, De La Nunez went into the bathroom and continued to get ready for work. Gomez remained in the kitchen, cooking the liver and preparing breakfast.

De La Nunez, who was "upset from hearing [Gomez's] constant complaining," became "very angry." Using profanity, she told Gomez that he did not have to finish the cooking. De La Nunez, who was angrier than Gomez, walked into the kitchen and grabbed Gomez's right arm as he was standing at the kitchen sink. De La Nunez pushed Gomez and, although he again complained, he said he would finish the cooking.

De La Nunez went back into the bathroom for a few minutes. When she returned to the kitchen, the situation "escalated." She became more abusive verbally and again grabbed Gomez's arm. As Gomez turned around, De La Nunez realized he had a knife in his hand. She grabbed the knife in an attempt to take it away from Gomez. De La Nunez, however, did not realize that she had grabbed the blade of the 14-inch knife. When Gomez backed up, De La Nunez continued to hold onto the blade, which cut her index and middle fingers.

After realizing she had been cut, De La Nunez, who was still angry with Gomez, also became frightened and nervous. Gomez retrieved a towel from the bathroom and wrapped De La Nunez's hand in it. The two then "headed toward[] the door because [De La Nunez] knew that [she] needed medical attention." However, De La Nunez was still angry with Gomez and she

---

[2]We view the evidence in a light most favorable to the respondent. (*People* v. *Rayford* (1994) 9 Cal.4th 1, 23 [36 Cal.Rptr.2d 317, 884 P.2d 1369].)

cursed at him, telling him that she did not want him to take her to the hospital.

As De La Nunez stepped out of the house, her parents drove up in their car. De La Nunez's parents drove her to the hospital, while Gomez followed in a separate car. De La Nunez believed the accident with the knife occurred at approximately 8:30 a.m. She arrived at the Glendale Memorial Hospital emergency room at approximately 9:30 a.m.

At the hospital, De La Nunez told a physician that she had "cut [her]self with a knife." When the doctor inquired further, De La Nunez said, " 'I took the knife away from my boyfriend.' " De La Nunez did not tell the doctor that her boyfriend had been threatening her. De La Nunez explained to the doctor that the injuries visible on her neck had occurred two days before the "incident" with the knife. Her neck injuries occurred when she, Gomez, and other family members had gone to the park. De La Nunez's son and sister had started to wrestle and, when De La Nunez tried to break them apart, De La Nunez's sister scratched De La Nunez on the neck.

While still at the hospital, De La Nunez spoke with two police officers. She was hesitant to speak with the officers because she at "no time . . . indicate[d] that [hospital personnel] should call the police or that [she] needed that type of assistance . . . ." When she spoke with the officers, De La Nunez admitted she was "not truthful." She was still extremely angry and was "trying to get [Gomez] in trouble." Since the officers' questions were "leading and suggestive," it was easy for De La Nunez to answer them. However, De La Nunez never told the officers that Gomez had become angry, had yelled profanities at her, and had then held a large kitchen knife to her throat. De La Nunez never told officers that, while he held the knife at her throat, Gomez said, "Why are you making me do this?" De La Nunez also never told the officers she was frightened and grabbed the knife blade in self-defense and to avoid serious injury.

De La Nunez returned home that evening and received a call from Gomez, who had been arrested and taken into custody. Throughout the next several months, Gomez placed numerous collect telephone calls from the jail to De La Nunez. The collect charges for De La Nunez's telephone bill for April 1997, amounted to $84.29. Collect charges were $538.39 for May, $347.46 for June, and $172.70 for July. Collect calls for August and September totaled more than $1,000.

b. *Testimony of Officer Cynthia Griffith.*

On the morning of April 9, 1997, Los Angeles Police Officer Cynthia Griffith (Griffith) and her partner, Jose Arellano, responded to a call directing them to Glendale Memorial Hospital to investigate an assault with a

deadly weapon related to domestic violence. At approximately 10:05 a.m., the officers interviewed De La Nunez. Most of the questions Griffith asked De La Nunez called for a narrative answer. De La Nunez told Griffith that she and Gomez had argued about whether she should go to work. While De La Nunez was in the bathroom getting ready to leave, the argument became more heated and Gomez began to shout profanities at her. Gomez grabbed a knife from the kitchen and moved toward her. Holding the knife in a "horizontal manner," he placed it against De La Nunez's throat and said, "Why are you making me do this?" De La Nunez was frightened and grabbed the knife blade with her right hand in an attempt to defend herself. When Gomez saw De La Nunez holding the knife, he "pulled it in a sliding manner away from her hand, injuring her fingers."

When Griffith asked De La Nunez if she was afraid of Gomez, De La Nunez looked away and appeared "a little shaken." When Griffith asked De La Nunez if she was "afraid [Gomez] was going to hurt [her]," De La Nunez moved her head up and down and began to cry and "shak[e] all over." Griffith noticed there were faint but distinctive scratches on De La Nunez's throat. De La Nunez explained that the scratches were "from the knife."

    c.   *Testimony of Dr. Karen Feeney.*

Dr. Karen Feeney (Feeney) was working in the emergency room when De La Nunez arrived. When Feeney interviewed De La Nunez at approximately 9:10 a.m., De La Nunez stated Gomez had been threatening her. De La Nunez had cut her hand when she tried to take a knife away from Gomez. De La Nunez did not tell Feeney that she had injured her hand because she had grabbed a knife without looking. Feeney did not treat De La Nunez for any neck injuries.

    d.   *Testimony of Gail Pincus.*

Prior to trial, the prosecutor indicated she intended to present expert testimony regarding battered women's syndrome. The expert, Gail Pincus (Pincus), is the director of a domestic abuse center which deals with battered women and their children as well as a licensed clinical social worker and a mental health professional. The prosecutor asserted Pincus's testimony was necessary to show "why women who have been assaulted by their husbands or boyfriends later recant, minimize, suffer memory lapses due to post-traumatic stress, and decline to 'prosecute' their assailants."

Outside the presence of the jury, the trial court indicated it would allow the testimony on a limited basis. The court stated, "I want to limit the

issues—this is an expert, . . . . I guess she's the most qualified one in the county on this. But anyway, minimize [*sic*] memory lapses, stress, decline to prosecute, [I want you to ask her about just] those issues . . . . [¶] The other thing is that I'm trying to avoid the use of the words 'battered women's syndrome,' because I don't think there's been any evidence that she had . . . any previous battering." The court concluded, "[T]his witness is admitted as an expert on people who cohabitate [*sic*] together as husband and wife, and [to explain what] they do whether they've ever been battered before or not."

Defense counsel objected to Pincus's testimony, arguing there was "no evidence of any prior conduct that would make this expert's testimony relevant . . . ." Counsel asserted there was no evidence of any prior violent conduct or abuse, and that the People had failed to lay any factual foundation for Pincus's testimony. In response, the trial court stated the evidence would "not be based on . . . [a] finding that this was a battered woman . . . ." The court continued, "[The evidence is being admitted to show] that this is a husband and wife, and most wives, or a lot of wives, generally want to decline to prosecute, especially when they're going to go back to the man . . . . [I]t's evidence of people who cohabitate [*sic*] together as husband and wife . . . ."

Before Pincus testified, the trial court instructed the jury in part as follows: "All right, in this case, this is [*sic*] limited instructions—the evidence will be limited. You should consider this evidence for the limited purposes concerning cohabitants, not a wife, but a cohabitant in that spousal position. The characteristics of spouses in general, a class, it does not apply. She cannot testify about what happened in this case, because she was not there. But you use this in your evaluation of the whole case. This opinion is evidence."

Pincus testified she had never met De La Nunez or Gomez. Instead, her testimony addressed the profile of a typical battering male, a psychological analysis of battered females, and an analysis of the relationship between the two.

Pincus stated that about 80 percent of the time a woman who has been "initially assaulted" by a boyfriend, husband or lover will recant, change or minimize her story. This recanting does not happen only after there has been a continuing pattern of abuse. In fact, depending on the severity of the incident, it is more likely to occur after a first incident. Pincus stated a woman will tend to minimize and deny the incident. The woman will engage in "self-blam[e]" and "sort of reconstruct[] th[e] incident, especially if th[e]

relationship is going to continue. It's the most common [reaction] of anybody who's been victimized in an intimate relationship."

Pincus gave a lengthy explanation of the "male batterer." She stated that, in the beginning of a relationship he will be charming, romantic and intense. He will also, however, be rigid in his views regarding how men and women should behave in a relationship. Men who batter are frequently jealous. In addition, 50 to 60 percent of cases involving a batterer involve the use of alcohol or drugs.

Once a woman has committed to a relationship with a batterer, a cycle of violence begins. The batterer has an absolute need for power and control over his female partner. The relationship usually follows a "three-phase cycle." The first and longest cycle is referred to as the "tension rising period." The second cycle involves actual physical violence. Finally, there is a "honeymoon" or "hooking back" cycle. During the tension rising period, the batterer criticizes his partner. When she becomes upset, he says he was only joking and she is being hysterical. Although the relationship may appear to be going well, the man will start to emotionally abuse his partner by calling her names and insulting her. The batterer will then isolate the woman from her friends, coworkers, and family. Economic control is a common element in abusive relationships and it does not matter whether the man or woman is earning the greater amount of money. Not every one of these factors is present in every relationship. Each batterer tends to have a favorite tactic. However, the male batterer is often called a "Dr. Jekyll and Mr. Hyde" because people outside the immediate family see him as charming and nice, while family members "know[] what goes on behind closed doors."

The male batterer will make his partner dependent and attack her self-esteem. The woman will then "begin[] to believe that she can't trust her friends, [that] her family interferes, . . . [that] her male friends are only after sex, that she's fat, stupid, ugly, and incompetent, [that] she's crazy, hypersensitive, hysterical, [and] P.M.S.ing all the time, [that] nobody would ever want her, and [that] she's really, really lucky to be in this relationship with this guy." The man will start to blame the woman for everything that goes on around him. He will use coercion, threats and intimidation to maintain control of his partner. A batterer will sometimes coerce the woman into sexual acts. He may force her to watch pornographic movies and ask her to engage in some of the activities portrayed in the films. If she does not wish to engage in the sexual activities, he will tell her that she is not normal sexually. A batterer will try "to get [his partner] to do some things that sort of cross her own bottom line. And when he's able to do that, he's able to get

her to feel guilty and ashamed about things that are going on in their relationship, things that she's uncomfortable with, then he begins to make threats."

At this point in the testimony, the trial court excused the jury for a recess, then addressed the witness. The court stated, "I wanted to tell the witness that the court has limited certain matters. This is not a typical battered-wife-type situation. What I want to do is, when we come back, I want you to go into, not so much of the man, but the reaction of the woman when she comes to court and things like that. So I know—I don't want your whole treatment. I want you to shift from that, going into describing the typical woman and how much it fits into the issues we're talking about. You know, of course, I know you could probably go two or three hours, which I'm enjoying it, but it may not apply to this case."

Defense counsel made a motion for a mistrial and renewed his objection to Pincus's testimony, arguing the prosecutor had presented no evidence as a foundation for the expert's opinion. Counsel asserted, "[T]he prosecutor has laid no foundation that Mr. Gomez was a charming romantic, intense, rigid in [his] views, a rule setter, jealous, that alcohol was involved, that drugs were involved. I mean, there's no evidence of any of that." The trial court denied defense counsel's motion, stating, "I will try to instruct the jury that what she has described, there is no evidence in this case concerning Mr. Gomez . . . ."

When the jury returned to the courtroom, the trial court stated it would "instruct the jury [regarding] what we heard about the so-called male." The court then addressed the jury and stated, "There has been no evidence about Mr. Gomez, so [the expert] was just giving us her rendition of the male. Now I want her to shift to the female. [¶] . . . It's interesting, very interesting though."

When Pincus resumed her testimony, she stated that, "after all of these things occur," the woman is "molded . . . to an extent." She begins to feel guilty and responsible. When a violent act takes place, she is usually terrified and shocked. The woman "never expected this person that she loves, this wonderful romantic, charming guy she's in love with to physically hurt her[.]" When the actual violent event occurs, the woman is able to feel and recall the details of the event. This short period is referred to as "a window." However, the "window [will] . . . stay open" only if the woman leaves the relationship and has support in the outside community. If the woman has contact with the batterer, the "window" will close. The batterer

will start a honeymoon period and will tell the woman he loves her, that the incident was an accident, and that he never meant to hurt her. The batterer will make the woman promise she will not talk to anyone about the incident, that she will not go to court, and that she will tell the police she lied about the violence.

This "window" may close for financial reasons, because of the woman's lack of self-esteem, or because of her loneliness. The woman will lose sight of what actually happened and begin to believe the batterer's version of events. She may become angry with prosecutors, the judge, and everyone else in the courtroom. This behavior, sometimes referred to as the "Stockholm Syndrome," occurs when a hostage begins to view her attacker as the "good guy" and as the one who is misunderstood.

Pincus stated that people who have been abused do not usually appear to be meek and mild. In addition, the longer an individual is in an abusive relationship, the more that person's perspective is likely to change. Generally, when an abused woman discusses a battering event, she will tell a "different story" by recanting or minimizing the event. If a woman wishes the relationship with her batterer to continue, she will tell the police and the prosecutor that the violent incident never occurred. She will then "rally some folks around" to support her story. A woman will react in this manner more commonly after the first event because she really wants to believe that the person who committed the act of violence is not the man she is in love with.

On cross examination, counsel asked Pincus whether there should be "some evidence somewhere that would reflect the fact that the husband or the significant other . . . is engaged in the type of activity that [is being discussed] . . . . What I mean by that is this, you indicated . . . that the person is usually [initially] charming, romantic, intense, rigid in [his] views, a rule setter, is jealous, there's alcohol, there's drugs. There should be some evidence somewhere in the record to support that, shouldn't there? [¶] . . . [W]hat I'm indicating is that there should be some factual background somewhere to support the fact that a person has engaged, or is engaging in this kind of conduct you're talking about, shouldn't there?" In response, Pincus stated, "Yeah, if you know where to look for it."

At the conclusion of Pincus's testimony, the trial court told the jury: "As I told the jury before, we have heard no evidence concerning the parties in this case."

### 2. Defense Evidence

De La Nunez's mother, Isolda Rodriguez, testified that when she arrived at De La Nunez's home at approximately 8:30 a.m. on April 9, De La Nunez

was standing outside the house holding a towel in her hand. De La Nunez "looked like something had happened." When Rodriguez inquired, De La Nunez told her mother that she "had an accident."

Rodriguez testified that two or three days before De La Nunez was cut with a knife, Rodriguez was at De La Nunez's home. De La Nunez's son and Rodriguez's daughter were watching television when they started to fight. When De La Nunez tried to separate them, Rodriguez's daughter scratched De La Nunez on the neck.

## CONTENTION

Gomez contends that the expert's testimony regarding battered women's syndrome was irrelevant because there was no evidence De La Nunez was a battered woman. He argues the evidence was highly prejudicial and its admission requires reversal of his convictions. The People contend the expert's testimony was relevant and properly admitted for a limited purpose. They further assert, if any error occurred, it was harmless.

## DISCUSSION

### 1. *Since There Was No Evidence De La Nunez Was a Battered Woman, Pincus's Testimony Was Irrelevant*

Evidence Code section 1107 provides in relevant part: "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge. [¶] (b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its *relevancy* and the proper qualifications of the expert witness. Expert opinion testimony on battered women's syndrome shall not be considered a new scientific technique whose reliability is unproven." (Italics added.)

Whether expert testimony regarding battered women's syndrome is admissible in a particular case initially depends on whether that evidence is relevant. "In making a determination of *relevancy*, the court must first decide whether the evidence in the particular case supports a contention that the petitioner was a battered woman. Expert testimony on battered woman syndrome is *irrelevant* unless there is a sufficient factual basis for the fact

that petitioner was a battered woman." (*Fennell* v. *Goolsby* (E.D.Pa. 1985) 630 F.Supp. 451, 459, italics added.)

In *People* v. *Humphrey* (1996) 13 Cal.4th 1073, 1084 [56 Cal.Rptr.2d 142, 921 P.2d 1], the defendant shot and killed the man with whom she had been living. Her defense was that she shot the man in self-defense. After presenting expert testimony regarding battered women's syndrome, the defendant herself testified that her relationship with the deceased had been abusive and violent. The defendant stated that both she and the deceased were heavy drinkers, the deceased frequently hit, kicked and threatened to kill her and, on the night before the killing, he shot at her. The defendant's testimony was corroborated by that of several other witnesses.

The *Humphrey* court determined evidence of battered women's syndrome was relevant to the defendant's credibility and to show whether she reasonably believed it was necessary to act in self-defense. (*People* v. *Humphrey, supra,* 13 Cal.4th at p. 1087.) In coming to this conclusion, the court recognized that "[b]attered women's syndrome 'has been defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an *extended period of time* by the dominant male figure in their lives." ' " (*Id.* at pp. 1083-1084, italics added; see also *People* v. *Romero* (1994) 8 Cal.4th 728, 735, fn. 1 [35 Cal.Rptr.2d 270, 883 P.2d 388]; *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1194 [264 Cal.Rptr. 167], disapproved on another ground in *People* v. *Humphrey, supra,* at p. 1089.)

Although there was no question that the defendant in *Humphrey* had been both physically and psychologically abused over a period of time, in the present case there is no evidence, with the exception of the present incident, to indicate De La Nunez is a battered woman. There was no evidence that Gomez had previously battered De La Nunez or that they were engaged in an ongoing abusive relationship.

The People assert it was not necessary to show De La Nunez had previously been abused by Gomez. They refer to Pincus's testimony that it is especially likely a woman will recant, minimize or completely deny the first violent incident.

■ Although a woman may minimize or deny a single instance of violence or abuse, her denial does not mean she suffers from battered women's syndrome. As the People's expert testified and as the court's opinion in *Humphrey* stated, battered women's syndrome is a series of characteristics which appear in women who have been abused physically and

psychologically over a period of time. (*People* v. *Humphrey, supra,* 13 Cal.4th at pp. 1083-1084.) A single violent incident, without evidence of other physical or psychological abuse, is not sufficient to establish that a woman suffers from battered women's syndrome.

Here, other than evidence of the present incident, there is no evidence indicating that Gomez abused or behaved violently toward De La Nunez. There is no evidence that Gomez fit the profile of a batterer, or that De La Nunez and Gomez were engaged in a "battering" relationship. On this record, Pincus's testimony regarding battered women's syndrome was irrelevant.

The People's reliance on *People* v. *Morgan* (1997) 58 Cal.App.4th 1210 [68 Cal.Rptr.2d 772] is misplaced. There, a woman reported to police and to an emergency room physician that her boyfriend had assaulted her. In making her report, she told police her boyfriend had "hit her in the past but never as badly as on th[at] occasion." (*Id.* at p. 1213.)

The woman in *Morgan* had resumed a " 'close relationship' " with her boyfriend by the time of trial, in which she recanted her previous story. (*People* v. *Morgan, supra,* 58 Cal.App.4th at p. 1213.) She testified her injuries had been accidental. The People's expert witness on battered women's syndrome testified that it was common for a battered woman to recant her original story, especially after the woman had decided to reconcile with her abuser. (*Ibid.*)

The *Morgan* court determined the expert witness's testimony was relevant to the issue of the victim's credibility. Citing *People* v. *McAlpin* (1991) 53 Cal.3d 1289 [283 Cal.Rptr. 382, 812 P.2d 563], which considered whether expert testimony explaining behavior exhibited by the parent of a molested child was appropriate, the *Morgan* court stated, " '[i]t is reasonable to conclude that on the basis of their intuition alone many jurors would tend . . .' [Citation.] [¶] . . . to doubt that [the woman] would recant a truthful statement in order to testify in an untruthful manner, effectively protecting her abuser. [Citation.] However, the prosecution had evidence that '[i]t is very common' for a woman who has decided to reunite with her batterer to recant and falsify information in order to justify her decision to stay with the batterer." (*People* v. *Morgan, supra,* 58 Cal.App.4th at p. 1215.) The court found the expert's testimony was "relevant and admissible to explain or offer a motive for [the woman's] recantation and thereby reconcile inconsistencies in her testimony." (*Ibid.*)

The People urge, as in the *Morgan* case, the jury in the present case was required to reconcile De La Nunez's conflicting stories. They assert it is

reasonable to conclude that many jurors, based on their intuition, would tend to doubt that De La Nunez would recant a truthful statement in order to testify in an untruthful manner to protect her abuser.

The facts in this case differ significantly from those presented in *Morgan*. In *Morgan*, there was evidence of prior violence and an ongoing abusive relationship. As we stated above, there is no such evidence here.

We note that had De La Nunez been charged with assaulting Gomez, she would not have been able to use evidence of battered women's syndrome in her defense without first laying the proper foundation, i.e., evidence indicating Gomez had abused her physically and psychologically over a period of time. Likewise, the People must present proper foundational evidence before they may use expert testimony regarding battered women's syndrome to explain why a woman may recant, minimize or completely deny a violent incident. In the present case, Pincus's testimony regarding battered women's syndrome was irrelevant and the trial court erred in admitting it.

### 2. *Admission of the Expert's Testimony Was Prejudicial*

The People concede that "Pincus's description of the typical male batterer and the 'three-phase cycle' of a typical batterer/batteree relationship was inapplicable to the present case." However, they urge the evidence was proper in the context of expert testimony and, in any event, caused Gomez no prejudice because the trial court instructed the jury the expert's testimony was to be considered for a limited purpose. Specifically, the trial court instructed that the evidence was to be considered only for "the limited purposes concerning cohabitants, not a wife, but a cohabitant in that spousal position. The characteristics of spouses in general, a class, it does not apply. She cannot testify about what happened in this case . . . ." This jury admonition is ambiguous at best.

Our review of the record indicates the People's case was primarily based on De La Nunez's statements to the emergency room physician and police officers. They argue that the doctor and police had no motive to lie and that De La Nunez's testimony about accidentally grabbing the knife blade was not believable. They urge this is especially true since De La Nunez had her parents, not Gomez, drive her to the hospital. Finally, the People assert, since the jury acquitted Gomez of the charge of felony corporal injury to a cohabitant, it must have carefully considered all of the evidence and clearly was not improperly influenced by Pincus's testimony.

Regardless of the evidence cited by the People, we cannot ignore Pincus's powerful testimony and its likely effect on the jury. Pincus's testimony was

authoritative. She was presented as a highly qualified expert. Her testimony was lengthy and dramatic. She explained in detail the several cycles of a typical battering relationship. She extensively described the male batterer, explaining how he first charms, then demeans and insults his partner. Pincus described a battering man as someone who both psychologically and physically brutalizes a woman to satisfy his need for power and control. She compared the relationship between a battering man and a battered woman to a condition called the "Stockholm Syndrome" which occurs when a hostage begins to view her "attacker" as "the good guy." Pincus testified a batterer is often referred to as a "Dr. Jekyll and Mr. Hyde."

The jury was further directed to Pincus's testimony when the trial court delivered CALJIC No. 9.35.1. That instruction explains that the evidence concerning battered women's syndrome could be considered for the purpose of showing that "the alleged victim's reactions, as demonstrated by the evidence, [were] not inconsistent with her having been physically abused, or the beliefs, perception or behavior of victims of domestic violence."[3]

Pincus's testimony was further emphasized by the prosecutor. After defense counsel argued there was no evidence indicating Gomez fit the profile of a batterer, the prosecutor, in her closing argument, stated, "[W]hen you look at [De La Nunez's] testimony, there is evidence based upon the experts that what she's doing now is coming in and doing exactly what the expert says she'll do, doing exactly what has happened in her dynamics with Mr. Gomez, and that is she's taking blame for everything. [¶] . . . [¶] Everything that [De La Nunez] told you fits in exactly with what the expert said is the way she would behave."

Both the trial court and the prosecutor emphasized Pincus's inflammatory testimony. Our review of the whole record indicates it is reasonably probable that the jury would have reached a result more favorable to Gomez had the court excluded Pincus's testimony. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

---

[3]As given in this case, CALJIC No. 9.35.1 reads: "Evidence has been presented to you concerning battered women's syndrome. This evidence is not received and must not be considered by you to prove the occurrence of the act or acts of abuse which form the basis of the crimes charged. [¶] Battered women's syndrome research is based upon an approach that is completely different from the approach which you must take to this case. The syndrome research begins with the assumption that physical abuse has occurred, and seeks to describe and explain common reactions of women to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. [¶] You should consider this evidence for certain limited purposes only, namely, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been physically abused, or the beliefs, perception or behavior of victims of domestic violence."

## DISPOSITION

The judgment is reversed.

Croskey, Acting P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied June 4, 1999, and respondent's petition for review by the Supreme Court was denied September 1, 1999.