Filed 9/25/15  P. v. De La Rosa CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D068055 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1203647) |
| ANGEL JACOB DE LA ROSA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Edward D. Webster, Judge.  Affirmed.

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Angel De La Rosa (Angel) guilty of four counts of intimate partner battery resulting in a traumatic condition (Pen. Code, § 273.5, subd.

(a)),[1] three counts of uttering a criminal threat (§ 422), one count of attempted criminal threat (§§ 422/664), one count of simple assault (§ 240), and one count of assault with force likely to cause great bodily injury with a true finding on a great bodily injury enhancement attached to that count (§§ 245, subd. (a)(4) & 12022.7, subd. (e)). The jury hung on several other counts. The court sentenced Angel to an aggregate term of nine years on the counts and allegations as to which the jury had reached verdicts. In subsequent proceeding, Angel pleaded guilty to two counts on which the jury had hung and the court sentenced Angel to an aggregate term of two years four months, to run consecutively to the nine-year term, for a total aggregate term of 11 years four months.

On appeal, Angel claims he was denied his right to present a defense because the court prevented him from introducing testimony that the victim, Jane Doe (Doe), had a history of mental health problems, and as a result impaired his ability to argue the injuries suffered by Doe were self-inflicted. He also asserts the court erred by allowing the prosecution to call an expert to testify to the "cycle of violence" involved in domestic violence relationships.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

# I

## FACTUAL AND PROCEDURAL BACKGROUND

A. <u>Facts</u>

*Overview*

Angel and Doe began an on-again, off-again dating relationship in late 2010 and Doe ultimately moved in with him, living with Angel at his family's home for a few months before she moved back in with her parents in February 2012. However, her parents disapproved of her relationship with Angel and gave her a choice: live with her parents at their home, or continue her relationship with Angel, but not both. Doe chose Angel, and she returned to live with him at his parent's home in May 2012.

On June 27, 2012, Doe left Angel's home permanently and returned to her parents' home. When Doe arrived, she had numerous physical injuries, and her mother and sisters began crying. Her oldest sister called the police, who came and photographed the injuries. Doe was examined by a doctor that day, who determined Doe had suffered multiple injuries, which were in various stages of healing.

The prosecution theory, supported principally by Doe's testimony, was that Angel had threatened Doe and physically abused her on numerous occasions in the approximately one month before Doe finally left him. The defense theory, supported principally by the testimony of Angel and his family and friends, was that Doe was a jealous girlfriend who lied about Angel's conduct toward her.

*Doe's Testimony and Corroborative Evidence*

Doe and Angel's on-and-off relationship was marked by constant arguments, which tended to revolve around Angel's feelings of jealousy. Angel was controlling: although Doe had a cell phone, Angel placed his own password on it so she could not use it without his permission, and he also made sure she could not access the land line in his house without his knowledge. He also would sit next to her when she used the computer.

In early June, Doe went with Angel to a swap meet in his newly acquired BMW. After they got into his car, Angel accused Doe of "looking at" another man in the parking lot and, when she denied it, he accused her of lying to him. As Angel drove them to a place called "the Point," a dead-end street with a view, he back-handed her in the face and said he would beat her until she told the truth. Angel had a Glock pistol in his car, and as they approached the Point he pulled it out, aimed it at her, and again accused her of lying about looking at the other man. He said he was tired of her lying and was going to kill her, and he had the perfect place. Doe was shaking and spilled some food on the floor of the car. Angel stopped the car at the Point and told her to clean it up or he would kill her right there and dump her body over the hill. He also told her to clean the blood from her nose, and to fix her makeup; he was angry she had got his new car dirty. After they left the Point, he told her why everything was her fault, and warned her to tell no one what had happened. She was scared and said nothing to anyone, and instead used makeup to cover the growing purple bruise under her eye.

4

Several days later, Doe needed to use her phone so Angel unlocked it for her. Angel spotted some texts from a boy (Torres) to Doe in which Torres referred to Doe as "doll." Angel became angry, and accused her of having sex with Torres. He used her phone to call Torres, and forced Doe to ask Torres why he had called her "doll." Torres explained it was a running joke between them. Angel then got on the phone and told Torres to stop calling or texting Doe. When Torres began to argue with Angel, he threatened to go to Torres's house to beat him up.[2] After the phone call ended, Angel demanded Doe tell him where Torres lived, but Doe said she did not know; Angel started hitting her in the face to extract Torres's address from her. Doe screamed, and Angel's father came in and told them he would not condone that in his home and to leave. They walked outside, and Angel pushed Doe into some bushes. They subsequently returned to the house, assuring Angel's father it was over, and went to Angel's room. However, when Angel's father and mother left the house, Angel resumed beating Doe, during which time he slapped her, punched her, choked her unconscious, and struck her with a bat. During the attack, after Doe said she would do anything to make him stop, Angel sodomized her twice, and had her perform oral sex on him.

After the attack ended, Angel told her it was her fault for making him so angry that he had to hit her. When Angel's parents returned to the house, Angel told her to stay out of sight, but Angel's mother saw the aftermath and yelled at Angel, but then switched to telling Doe she must have been asking for it. Doe told Angel's parents she wanted to

---

[2]     Torres confirmed he was on the receiving end of the phone call and that Angel threatened to come to his house to fight him.

go home, but they didn't want Doe's parents to see her condition. Doe also told Angel she wanted to leave, but he became angry and stomped on her phone (shattering it) and said the only way she would leave was in a body bag. However, he later was very remorseful, telling her he loved her and it wouldn't happen again.

The next day, Angel's sisters saw Doe's injuries. Arguments ensued among those present, and the group agreed Angel would stay with his sister for a few days while Doe remained at Angel's house to heal, after which Doe would return to her parents' home. Angel left his home for a few days but Doe stayed at Angel's home after he returned.

In mid-June, Angel's parents left them alone at their house. Angel and Doe argued and Angel slapped Doe, causing her nose to bleed. He continued hitting her, then choked her into unconsciousness. When she regained consciousness, he again choked her. When she tried to escape, he bit her hand and, at some point during the assaults, threatened her with a butterfly knife he always kept around, and choked her into unconsciousness again. When she again regained consciousness, Angel told her to clean herself up and to act as if nothing had happened.

On June 27, Doe finally left Angel's home after another attack. That day, Angel (angry at Doe because of her refusal to perform oral sex on him the previous day) demanded that Doe accompany him to pick up his sister at an animal shelter. While en route, he mentioned a friend was coming over to "smoke" (presumably marijuana) with Angel. He asked Doe whether she knew his friend and then accused her of having sex with him. He back-handed her in the face, and then pulled out a Glock and pointed at her

6

knees when she kept denying his accusations. Doe told Angel they were running late to pick up his sister and people might think something was wrong, so Angel drove to the animal shelter. He had Doe sit in the back seat (to prevent his sister from seeing Doe's injured lip) and told Doe to say nothing, and Doe complied. When they arrived at Angel's house, Angel dropped Doe off and departed. Doe went to Angel's father and said Angel had pointed a gun at her and she wanted to go home. When Angel returned, he and his father began fighting, and Angel's mother subsequently took Doe to Doe's parents' house. Doe left everything behind at Angel's house. When Doe arrived home, her mother saw her and burst into tears, and someone called police, who responded to the call and photographed Doe's injuries.

A district attorney investigator testified that bruises around the neck are often indicators of manual strangulation, and that certain marks on Doe's back were consistent with bite marks. The treating physician testified the injuries on Doe were in various stages of healing, including a scabbed-over bite mark.

Police went to Angel's house on the evening of June 27 and arrested Angel. However, his BMW was not there when they arrested Angel. Police were unable to search the BMW until July 19, around three weeks after the arrest, and Doe's blood was found in Angel's car. Police never found the Glock but did find, secreted in a speaker in Angel's parents' bedroom, a loaded Glock magazine. During the same search police found a butterfly knife hidden in Angel's parents' bedroom.

7

*Defense Evidence*

Angel's family and a friend denied ever seeing any injuries to Doe, and Angel claimed he was not violent toward Doe except when he acted to defend himself from her assaults on him. However, the jury was provided with the transcript of a jailhouse phone conversation between Angel and his family members during which they discussed the importance that "our stories gotta match."

II

ANALYSIS

A. The Excluded Evidence Claim

Angel argues the court erroneously prevented him from questioning Doe about her history of mental health problems and therefore interfered with his ability to bolster his defense that the injuries Doe suffered were self-inflicted.

*Background*

Prior to trial, the prosecutor moved to exclude references to Doe's prior mental health difficulties. About six months before the attacks, Doe was hospitalized and received medication for some undisclosed mental issue, but was not under treatment at the time of the attacks. The defense claimed the evidence was relevant to provide "background" for why Doe was living with Angel and did not want to return home. The defense suggested that, when and if the defense wished to delve into Doe's mental health issues, it would make an offer of proof and have the court rule on admission of that evidence at that time. The court agreed to exclude mention of her mental health but

8

noted the ruling was without prejudice to revisiting the issue at such time as its relevance became pertinent.

During Angel's cross-examination of Doe, after she stated Angel's father saw her wiping her bloody nose and that the father suggested she was just trying to get attention for herself, the court sustained objections to several questions by defense counsel that suddenly began asking about whether Angel's father was aware of Doe's purported mental health issues. The court ruled the questions were irrelevant and violated its in limine ruling. In a subsequent hearing outside the presence of the jury, the court clarified that Angel was not entirely barred from questioning Doe about mental health issues, but instead needed to demonstrate the relevance of the evidence. The defense later stated it had information Doe was a "cutter," and noted the location of some of the bite marks (the ones on her hands) were consistent with self-infliction. The court, although observing other injuries (bite marks and bruises on her back) were inconsistent with self-infliction and the bite marks on her hands were equally consistent with Angel inflicting those injuries, ultimately ruled Angel could introduce evidence Doe had bitten herself (or hit or cut herself) in the past and the defense subsequently elicited her admission she had a history of cutting herself. The court also inquired about a prior suicide attempt by Doe, and learned that she had been in the eighth grade and had watched as her grandfather had died, and she had tried to commit suicide by cutting herself; the court ruled the attempted suicide attempt was not itself relevant. The defense never made any further proffer it had

9

evidence concerning Doe's mental health history, much less a proffer accompanied by an explanation of how the evidence would be relevant.

*Analysis*

Angel asserts he was improperly prevented from introducing evidence of Doe's previous suicide attempt, and other evidence of her more recent mental health issues (including her hospitalization and her psychotropic medication regimen), in violation of his constitutional rights to present probative evidence pertinent to his defense (*People v. Reeder* (1978) 82 Cal.App.3d 543, 553; *Crane v. Kentucky* (1986) 476 U.S. 683, 691), and to cross-examine his accuser (*Davis v. Alaska* (1974) 415 U.S. 308, 316). However, the right to present a defense does not allow a defendant to present irrelevant evidence, and a trial court has discretion to determine whether to exclude evidence as irrelevant. (*People v. Thornton* (2007) 41 Cal.4th 391, 444-445.) Our Supreme Court has repeatedly explained that "[a] trial court's decision to admit or exclude evidence is reviewable for abuse of discretion" (*People v. Vieira* (2005) 35 Cal.4th 264, 292) and trial judges "retain 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citations.] A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or

10

patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

Angel cannot demonstrate that the trial court's refusal to allow him to delve into Doe's previous suicide attempt or the other purported evidence of her more recent mental health issues was an abuse of discretion because Angel never made an offer of proof. Angel never showed what evidence he actually sought to introduce or, more importantly, how that undisclosed evidence might be relevant to his claim the injuries Doe claimed were inflicted by Angel were in fact self-inflicted. "When a trial court denies a defendant's request to produce evidence, the defendant must make an offer of proof in order to preserve the issue for consideration on appeal." (*People v. Foss* (2007) 155 Cal.App.4th 113, 126; *People v. Lucas* (2014) 60 Cal.4th 153, 232-233 [defendant forfeits claim where he does not make offer of proof tendering contemplated witnesses or evidence for purposes of challenging the credibility of a witness], disapproved on other grounds by *People v. Romero* (Aug. 27, 2015, S055856) ___ Cal.4th ___ [2015 WL 5047523 at p. 32, fn. 19].) " ' "Before an appellate court can knowledgeably rule upon an evidentiary issue presented, it must have an adequate record before it to determine if an error was made." [Citation.]' [Citation.] 'The offer of proof exists for the benefit of the appellate court. The offer of proof serves to inform the appellate court of the nature of the evidence that the trial court refused to receive in evidence. . . . The function of an offer of proof is to lay an adequate record for appellate review. . . .' " (*Nienhouse v. Superior Court* (1996) 42 Cal.App.4th 83, 93-94.) "An offer of proof should give the

11

trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.]  To accomplish these purposes an offer of proof must be specific.  It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued."  (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53.)

Here, Angel did not give a specific offer of proof of the evidence to be produced, and his only proffered relevance for the evidence was that Doe's mental history would (1) provide some "background" for why she was living with Angel and did not wish to return home, and (2) show she had a history of self-harm.  The court *permitted* Angel to produce any evidence he had concerning her history of self-harm.  Angel made no showing that any *other* evidence of her generic mental health concerns had any relevance to the issues in the case.  On this record Angel cannot show that exclusion of the evidence of Doe's previous suicide attempt, and other evidence of her more recent hospitalization or her medication regimen, was an abuse of discretion.

B. The Expert Testimony Claim

Angel argues the court erred by allowing the prosecution to call an expert to testify to the so-called "battered woman syndrome" (BWS) involved in domestic violence relationships because (1) there was an inadequate foundation Doe had endured an extended period of physical violence necessary for the creation of BWS, and (2) there was no foundation that the type of intermittent relationship between Doe and Angel as existed here could provide the milieu from which BWS can emerge.

12

*Background*

Prior to trial, the defense moved in limine to preclude the prosecution from calling an expert to testify about domestic violence and why a victim would remain with an abusive partner instead of reporting the abuse. The defense argued the length of their relationship was inadequate to show Doe was enmeshed in the cycle of violence typically present in BWS cases. The court concluded the length of the relationship, even though it was an on-again, off-again relationship, was adequate to provide a foundation for the expert's opinions, and the defense could cross-examine the expert on length of the relationship to undermine the expert's opinions.

*Analysis*

Angel asserts that it was error to permit the expert to testify about BWS because the court in *People v. Gomez* (1999) 72 Cal.App.4th 405 held that evidence of a single violent incident without evidence of other abuse was insufficient to establish that a woman suffered from BWS, and therefore held it was reversible error to admit expert testimony regarding BWS. (*Id.* at pp. 417-419.) However, the People assert the Supreme Court in *People v. Brown* (2004) 33 Cal.4th 892 concluded expert testimony concerning the behavior of victims of domestic violence *was* admissible under Evidence Code section 801 (admissibility of expert opinion testimony) even though the evidence showed only one violent incident because the "evidence presented at trial suggested the possibility that defendant and [his live-in girlfriend] were in a 'cycle of violence' of the type described by [the] expert" on the evening of the assault (*Brown,* at p. 907), and

13

explicitly disapproved "any language" in *Gomez* contrary to its conclusion. (*Brown,* at p. 908.) However, the *Brown* court explicitly stated it was not reaching the question of whether the expert testimony was *also* admissible under Evidence Code section 1107. (*Brown,* at p. 896.)

We are convinced the expert's testimony was admissible under the rationale of *Brown.* Although Angel correctly notes *Brown* explicitly declined to reach the issue of whether a single act of violence was adequate to permit admission of expert testimony of BWS under Evidence Code section 1107, we are unpersuaded by Angel's effort to explain why *Brown's* explicit approval of the admission of such evidence under the *alternative* basis of Evidence Code section 801 would not support the trial court's ruling here. *Brown* noted that "under subdivision (a) of section 801, expert testimony is admissible on any subject 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Brown*, *supra*, 33 Cal.4th at p. 905.) *Brown*, after noting "the close analogy between use of expert testimony to explain the behavior of domestic violence victims, and expert testimony concerning victims of rape or child abuse" (*ibid*.), explained the Supreme Court has held "expert testimony concerning rape victims—the rape trauma syndrome—to be admissible under section 801 to dispel common misconceptions about how such victims behave [citation] . . . ." (*Ibid*.) That was the purpose for which the expert testimony was proffered here: to dispel the common misperception that, if a person had in fact suffered violence at the hands of her partner, the victim would have immediately reported it or left the relationship. Because

14

*Brown* concluded testimony of an expert is admissible under Evidence Code section 801 to dispel common misconceptions about how victims might behave—even when there was only evidence of a single violent event, the fact that Doe had only endured beatings over a one-month period did not require the court to exclude the expert testimony about BWS.

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.