Filed 11/8/23  P. v. Urteaga CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081317 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE409208) |
| OSCAR NICHOLAS URTEAGA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Oscar Nicholas Urteaga of, among other charges, stalking.  At trial, M.D. testified about her romantic yet turbulent relationship with Urteaga.  M.D.'s husband, J.D., testified that, from his

perspective, M.D. acted like someone with "battered woman syndrome." On appeal, Urteaga argues that J.D.'s "battered woman syndrome" testimony was improperly admitted and prejudiced the outcome of the case.

We agree that J.D.'s statement was improper expert testimony offered by a lay witness that should have been excluded. J.D. was not qualified to testify as an expert about battered women's syndrome. Battered women's syndrome is not a common perception that lay witnesses can opine on. It requires an expert's specialized training or knowledge, which J.D. lacked.

Nevertheless, J.D.'s "battered woman syndrome" testimony did not unduly prejudice the verdict. There was sufficient evidence, aside from J.D.'s testimony, that supported the stalking charge against Urteaga. Accordingly, the error admitting J.D.'s statement was harmless.

We therefore affirm the judgment.

I.

Urteaga was charged with stalking (Pen. Code, § 646.9, subd. (a); count 1); corporal injury to spouse and/or roommate (Pen. Code, § 273.5, subd. (a); count 2); false imprisonment (Pen. Code, §§ 236, 237, subd. (a); count 3); simple battery upon a person of a previous or a current dating relationship (Pen. Code, § 243, subd. (e)(1); count 4); dissuading a witness from testifying (Pen. Code § 136.1, subd. (a)(1); count 5); and violation of a protective order in a criminal proceeding involving domestic violence (Pen. Code § 166, subd. (c)(1); count 6), all of which related to his treatment of M.D.

M.D., her husband, J.D., and Urteaga testified at trial.

A.

M.D. testified that sometime in the summer of 2017, she met Urteaga and they began a romantic relationship that lasted two years. Initially, M.D. did not tell J.D. about the relationship.

According to M.D., Urteaga began physically abusing her in July 2018. On one occasion, Urteaga became "angry and physical" with M.D. after she declined to attend a party with him. Urteaga caused "bruises on [M.D.'s] body" and "face." Afterwards, M.D. filed a police report and did not speak with Urteaga "for a couple of weeks." Even so, the relationship continued.

In September 2018, M.D. tried to break up with Urteaga. In response, Urteaga texted her, "[Y]ou will always be mine. I own you." M.D. felt Urteaga "had control over [her]." He would send "loving" messages, ask for forgiveness, and be kind. But Urteaga's good behavior never lasted. He called M.D. and threatened that "[her] life [was] over" at work, with her family, friends, and children. M.D. testified she felt scared by Urteaga's threats and feared that he would "ruin [her] life."

By that winter, M.D. felt "stuck in a web where [she] couldn't get out" because Urteaga "kept texting and calling." Urteaga continuously called M.D., and he began sending sexual and private photographs to her mother and sister. M.D. reported that Urteaga became "very vindictive" and expressed that "he wanted revenge."

On June 13, 2019, M.D. obtained a temporary restraining order (TRO) against Urteaga because he sent messages to her work email address and began texting pornographic websites and dating websites to her underage daughters. Despite being aware of the TRO, Urteaga nevertheless continued contacting M.D. By July 2019, M.D. dismissed the TRO "by mistake."

On August 9, 2019, M.D. stayed at a local resort with her family. That day, Urteaga video messaged M.D. to ask if she was at the resort and demanded to see her. M.D. agreed to meet Urteaga to avoid "any bad" incidents in front of her family. When M.D. met Urteaga by his car at the resort's valet, she "could see that he was angry." Urteaga opened the car door

and told M.D. to get inside. M.D. did so because she felt she was "protecting" her children by "trying to keep [Urteaga] calm." As soon as M.D. got in the car, Urteaga began questioning what she was doing at the resort and with whom she was spending her time. Urteaga drove into a nearby parking lot and began punching M.D.'s arms, legs, and face repeatedly, leaving bruises. M.D. was initially unable to exit the car because it was still moving. Once M.D. eventually got out of the car, she ran out of the parking area and back to the resort. Afterward, M.D. filed a report of the incident with the police. Later that month, M.D. obtained a criminal protective order and a new restraining order against Urteaga.

During a follow-up investigation with the police, M.D. mentioned that "Urteaga seemed to know where [she was] a lot." An officer asked M.D. to check her cellphone and car for tracking devices. M.D. found an application installed on her cellphone "with the location being tracked." Once she discovered the tracking application, M.D. "decided to get rid of the phone completely," after which Urteaga "didn't know where [she] was at all times."

On August 20, 2019, Urteaga violated the criminal protective order and restraining order by texting M.D. Around the same time, Urteaga placed M.D.'s cut up underwear in M.D.'s mailbox.

In early September 2019, Urteaga emailed M.D. a prewritten statement and asked her to approve it. The prewritten statement expressed M.D.'s "desire to drop all charges" against Urteaga related to the criminal matter and claimed that she had not "been hurt or threatened in any way." M.D. did not sign the statement. A few days later, Urteaga left M.D. a voicemail playing countdown music. M.D. understood Urteaga's voicemail as a warning that her time was running out to sign the prewritten statement.

4

In early August 2021, M.D. was in her car with two of her daughters while the third was playing soccer. Urteaga drove to M.D.'s parked car and asked if he could get in the car to apologize to her daughters. M.D. let him, even though one of her daughters was "afraid." After apologizing, M.D. told Urteaga "he needed to walk away," and he did.

A week later, Urteaga parked in front of M.D.'s car while she was at her oldest daughter's soccer game. M.D.'s daughter "got really scared," so M.D. told her to go in the opposite direction while M.D. retrieved the car. Urteaga "was angry" when he approached M.D. at her car. M.D. "kept asking him to walk away," but Urteaga "continued to say that he was going to make sure that [M.D.'s daughter] wouldn't play" soccer at that field "anymore." M.D.'s oldest daughter stopped playing soccer because "[s]he was afraid to go back to the field."

## B.

At trial, J.D. supported M.D.'s telling of the events. He testified that M.D. was "terrified" of Urteaga. He described her as being "stuck in a web" where Urteaga would "scare and then manipulate her"—"almost like battered woman syndrome." When J.D. mentioned "battered woman syndrome," defense counsel objected to his testimony as an expert opinion. The trial court overruled the objection. J.D. explained that M.D. would "cry all night long" yet "give in and go" back to Urteaga after he sent "all these amazing texts." Her relationship with Urteaga, in J.D.'s view, would vacillate between being a "great situation" and a "horrible situation," with M.D. giving into Urteaga and "regret[ting] it the second" she went back to him.

J.D. testified that "if you look at the definition of battered woman syndrome, it was— [M.D.] was a textbook—." Defense counsel again objected. After the court overruled the objection, J.D. finished his sentence:

5

"Textbook case. And that's where every therapist we went to was saying the same exact thing." Defense counsel did not object to J.D.'s statement about "every therapist."

## C.

Urteaga denied M.D. and J.D.'s allegations. He testified that he never physically abused M.D., "[n]ever" "put a hand" on her. Urteaga classified the testimony about him placing cut-up underwear in the mailbox as "not true." He denied leaving M.D. the voicemail with countdown music. Urteaga claimed that M.D.'s first TRO came as a "complete surprise" to him. Urteaga further claimed that he "was in fear of [his] safety," not the other way around.

## D.

The jury found Urteaga guilty of stalking (Pen. Code, § 646.9, subd. (a); count 1); simple battery upon a person from a previous or a current dating relationship (Pen. Code, § 243, subd. (e)(1); lesser included offense for count 2); misdemeanor false imprisonment (Pen. Code, §§ 236, 237, subd. (a); lesser included offense for count 3); simple battery upon a person from a previous or a current dating relationship (Pen. Code, § 243, subd. (e)(1); count 4); dissuading a witness from testifying (Pen. Code § 136.1, subd. (a)(1); count 5); and violation of a protective order in a criminal proceeding involving domestic violence (Pen. Code § 166, subd. (c)(1); count 6).

The trial court imposed a suspended sentence of 270 days of local custody subject to three years of formal probation.

## II.

On appeal, Urteaga contends the trial court erred by allowing J.D. to testify that M.D. acted like someone with "battered woman syndrome"

6

because such testimony requires an expert opinion.[1]  Urteaga also contends that lay witnesses like J.D. cannot opine on a "particular mental state," which in this case refers to battered women's syndrome.

Respondent contends:  (1) J.D.'s reference to "battered woman syndrome" was permissible lay witness opinion testimony that was rationally based on his perception and was helpful to a clear understanding of his testimony; (2) J.D. testified about M.D.'s objective behavior and described it as being consistent with M.D.'s state of mind; and (3) even if J.D.'s testimony was erroneously admitted, any error was harmless considering the significant independent evidence of Urteaga's guilt.

We agree that the trial court improperly admitted J.D.'s testimony about battered women's syndrome.  Nonetheless, we find the error was harmless.

### A.

We evaluate a trial court's evidentiary rulings for abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

### 1.

"[B]attered women's syndrome is a series of characteristics which appear in women who have been abused physically and psychologically over a period of time."  (*People v. Gomez* (1999) 72 Cal.App.4th 405, 416 (*Gomez*).)

---

[1]  Urteaga also argues the trial court improperly admitted J.D.'s testimony that "every therapist" that he and M.D. went to "was saying the same exact thing" about battered women's syndrome.  But Urteaga did not object to that testimony during trial, and thus did not preserve the issue for appeal.  (*People v. Williams* (2008) 43 Cal.4th 584, 620.)  Even if Urteaga had objected, we conclude that he waived the point on appeal by not providing any authority or supporting argument related to the statement about therapists.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*).)

Testimony about battered women's syndrome, also known as intimate partner battering, requires expert qualifications. Evidence Code section 1107 "expressly authoriz[es] the admission of expert testimony regarding intimate partner battering and its effects." (*In re Walker* (2007) 147 Cal.App.4th 533, 546.) Under section 1107, the offering party must establish the "proper qualifications of the expert witness." (Evid. Code, § 1107, subds. (a) & (b).) Before someone can testify as an expert, the trial court must find that the witness has "special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his [or her] testimony relates." (Evid. Code, § 720.)

Expert testimony about battered women's syndrome is helpful to explain why "people who have been physically and mentally abused . . . act in ways that may be difficult for a layperson to understand." (*People v. Riggs* (2008) 44 Cal.4th 248, 293 (*Riggs*).) For example, in *Gomez*, a licensed clinical social worker and mental health professional explained at length the dynamics between a woman who has been battered and the "male batterer." (*Gomez*, *supra*, 72 Cal.App.4th at pp. 410-413.)

Here, the testimony about battered women's syndrome was given by J.D., a layperson without special knowledge, skill, experience, training, or education on the syndrome and its effects. (Evid. Code, § 720.) Unlike the expert in *Gomez,* J.D. was not a licensed clinical social worker or a mental health professional. (*Gomez*, *supra*, 72 Cal.App.4th at pp. 410-413.) J.D. does not possess the background that would qualify him to offer expert testimony about battered women's syndrome. Respondent concedes that J.D. was not an expert in this field.

J.D.'s statement was improper expert testimony offered by a lay witness and thus should have been excluded.

8

2.

Nor was it appropriate for J.D. to testify about battered women's syndrome as a lay witness. Lay opinion testimony is admissible when it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of his [or her] testimony." (Evid. Code, § 800.)

Although Respondent contends that J.D.'s testimony on battered women's syndrome conveyed his perception of M.D.'s state of mind and behavior consistent with that state of mind, his testimony went beyond the proper scope of lay opinion. Battered women's syndrome involves "a series of characteristics" that make up a psychological condition over time. (*Gomez, supra,* 72 Cal.App.4th at p. 416.) What constitutes battered women's syndrome is not a matter of common knowledge because one cannot rely on their senses alone to perceive a psychological "series of characteristics" but rather requires a special knowledge and expert experience. (See *Riggs, supra,* 44 Cal.4th at p. 293; Evid. Code, § 720.) As a result, battered women's syndrome is not like the commonly discernable perception that someone is drunk or angry, which does not require expert knowledge to identify. (See *People v. Chapple* (2006) 138 Cal.App.4th 540, 547.) Thus, J.D. could not opine on battered women's syndrome as a lay witness.

Therefore, the trial court erred when it allowed J.D. to testify about battered women's syndrome. Because we find error on this basis, we need not reach Urteaga's other argument that the "battered woman syndrome" testimony was also improperly admitted because it was a "new theory" introduced for the first time at trial.

B.

Nevertheless, J.D.'s "battered woman syndrome" testimony did not prejudice the verdict. The parties agree that the *Watson* standard for

9

assessing prejudice applies here. Under *Watson*, we reverse only if it is "reasonably probable" that Urteaga would have obtained a "more favorable" result absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Urteaga contends that J.D.'s testimony about battered women's syndrome amounted to prejudicial error. Although Urteaga argues that J.D.'s testimony could have swayed "at least one juror" on "some or all of the counts," he provides support and analysis only for the stalking conviction. Urteaga failed to support his prejudice claim for "all" other convictions "with reasoned argument and citations to authority." (*Badie*, *supra*, 67 Cal.App.4th at pp. 784-785.) Consequently, we treat his prejudice claim on his other convictions as "waived" and address only his stalking conviction. (*Ibid.*)

Even without J.D.'s "battered woman syndrome" testimony, it is not reasonably probable that the jury would have decided the stalking charge more favorably to Urteaga. In assessing what a jury is likely to have done absent an error, we "may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177, italics omitted.)

Stalking requires evidence that the defendant "willfully, maliciously, and repeatedly follow[ed] or willfully and maliciously harasse[d] another person" and made "a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family." (Pen. Code, § 646.9, subd. (a).) "For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the

10

person, and that serves no legitimate purpose." (Pen. Code, § 646.9, subd. (e).) " '[C]redible threat' " means "a verbal or written threat . . . made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family." (Pen. Code, § 646.9, subd. (g).) "It is not necessary to prove that the defendant had the intent to actually carry out the threat." (*Ibid.*) A defendant cumulatively "must do more than just cause alarm, annoyance, torment or terror; [they] must communicate a willingness to resort to violence." (*People v. Lopez* (2015) 240 Cal.App.4th 436, 449, italics omitted.)

Here, strong evidence supports Urteaga's stalking conviction independent of J.D.'s "battered woman syndrome" testimony.

Urteaga willfully, maliciously, and repeatedly followed M.D. by placing a tracking application on M.D.'s phone and showing up to her location to harass her. In one instance, Urteaga tracked and followed M.D. to a local resort for no other purpose than to confront and physically abuse her. In another instance, Urteaga tracked and followed M.D. to a soccer field where M.D. and two of her daughters were and confronted them in their car. A week later, Urteaga again tracked and followed M.D. to the soccer field with her daughter and confronted her and started an argument.

In addition, Urteaga made credible threats in the form of voice and text messages that placed M.D. in fear for her and her family's safety. He threatened to "ruin [M.D.'s] life" at work and with her family, children, and friends through a phone message. Those threats scared M.D. Urteaga then took steps to carry out his threat when he sent sexual and private photographs to M.D.'s mother and sister. Urteaga also left M.D. a voicemail with countdown music to warn her that time was running out to sign his prewritten statement to drop all charges. Although Urteaga denied sending

11

the voicemail and asserts that the messages M.D. identified "never threatened any physical harm to her or her family", a jury could reasonably find that Urteaga's "very vindictive" behavior placed M.D. in reasonable fear for her safety, not the least because he had physically abused her before.

In short, J.D.'s "battered woman syndrome" testimony was harmless because even without it, strong evidence in the record supports the jury's finding that Urteaga stalked M.D.

III.

We affirm the judgment.

CASTILLO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.