[No. A075675. First Dist., Div. Five. Sept. 29, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID MORGAN, Defendant and Appellant.

**COUNSEL**

Kathleen Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Christopher W. Grove and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

JONES, J.—Appellant David Morgan was charged by information with seven counts based on his alleged battery of Julie Parker.

On February 5, 1995, the date of the alleged battery, Parker told one sheriff's deputy that Morgan had beaten her. However, at trial, Parker

testified that on the date in question she was hallucinating and that Morgan was merely restraining her so that she would not leave the apartment. Parker also testified that she sustained some of her injuries as a result of falling and hitting her face on the floor.

In response to the fact that Parker had changed her description of events, the prosecution offered expert testimony on the subject of battered women's syndrome. A portion of this expert testimony addressed the prevalence with which battered women recant their stories.

A jury found Morgan guilty of five of the seven charged counts: two counts of assault by force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)); two counts of battery on a noncohabiting date (Pen. Code, § 243, subd. (e)); and one count of false imprisonment (Pen. Code, § 236).

The sole issue on appeal is the propriety of the admission of battered women's syndrome evidence. We conclude the evidence was properly admitted and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Julie Parker testified that she had been dating David Morgan for approximately three years prior to the events of February 5, 1995. Parker maintained a residence in El Granada and Morgan maintained a residence in San Francisco. Parker testified that she and Morgan spent at most one night each week together.

On February 5, 1995, Morgan was at Parker's apartment. At approximately 3 a.m., a neighbor heard screams of "[g]et away from me," and telephoned 911. Deputies from the San Mateo County Sheriff's Office arrived and determined that the screams were coming from Parker's apartment. Deputy Gonzales knocked on Parker's door. Eventually Morgan opened the door halfway. Ms. Parker ran naked from the apartment.

Deputy Gonzales got a sheet for Parker to use to cover herself. Deputy Gonzales testified that Parker seemed coherent and responsive and that she told him that the dispute had arisen over a night-light. Deputy Gonzales also testified that Parker told him that Morgan had hit her and punched her in the face.

Sometime after the deputies left, Parker went to the emergency room. Parker told the physician who treated her there that her boyfriend had

assaulted her. The physician testified that Parker appeared to have sustained multiple blunt injuries to her face and bruising on her wrists and her left shoulder.

Approximately three days after the incident, Detective Babwin, also with the San Mateo County Sheriff's Office, recorded a telephone conversation with Parker in which she again incriminated Morgan. Parker stated that Morgan hit her in the face and that he had hit her in the past but never as badly as on this occasion. This tape was played for the jury.

By the time of trial in July 1996, Parker had resumed a "close relationship" with Morgan. At trial, Parker testified to a different version of events. Parker explained that on February 5, she had been experiencing hallucinations brought on by the ingestion of alcohol and cocaine. Parker described experiencing hallucinations on one other occasion and stated that she had asked Morgan not to allow her to leave the apartment if that should ever happen again. As for the injuries she sustained on February 5, Parker explained that she sustained the black eye when she fell on her face and that her lips were swollen because Morgan had placed his hand over her mouth both to keep her from screaming and to restrain her from going outside.

The prosecution called Ms. Allard-Wills to testify as an expert witness on battered women's syndrome. Ms. Allard-Wills testified about common misconceptions surrounding domestic violence and explained why battered women often stay with or return to their abusers. Ms. Allard-Wills also testified that it was common for a battered woman to recant her original story, particularly after the woman has decided to reconcile with the abuser.

The jury found Morgan guilty on five of the charged counts.

## II. DISCUSSION

Morgan argues that the trial court erred in permitting the use of expert testimony on battered women's syndrome to bolster the credibility of Parker's earlier assertions that Morgan had beaten her.

"Battered women's syndrome 'has been defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." [Citations.]' " (*People* v. *Humphrey* (1996) 13 Cal.4th 1073, 1083-1084 [56 Cal.Rptr.2d 142, 921 P.2d 1] (*Humphrey*).) The admission of expert testimony on battered women's syndrome is expressly permitted by

statute. Evidence Code[1] section 1107, subdivision (a), provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

Judicial decisions have identified some of the purposes for which such evidence may be admitted. In *Humphrey,* for example, our Supreme Court affirmed the relevance of battered women's syndrome evidence to a claim of self-defense. (*Humphrey, supra,* 13 Cal.4th at p. 1084.) The defendant in *Humphrey* was a woman who had killed the man with whom she cohabited. (*Id.* at p. 1080.) The Supreme Court concluded that evidence of battered women's syndrome "is generally relevant to the reasonableness, as well as the subjective existence, of defendant's belief in the need to defend . . . ." (*Id.* at pp. 1088-1089, italics omitted.) The court concluded that battered women's syndrome evidence " 'would have assisted the jury in objectively analyzing [defendant's] claim of self-defense by dispelling many of the commonly held misconceptions about battered women.' . . . '[I]f the jury had understood [defendant's] conduct in light of [battered women's syndrome] evidence, then the jury may well have concluded her version of the events was sufficiently credible to warrant an acquittal on the facts as she related them.' " (*Id.* at p. 1087, citations omitted.)

Courts have reached similar conclusions as to the admissibility of expert testimony on other syndromes. For example, in *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] (*Bledsoe*), our Supreme Court concluded that expert testimony on rape trauma syndrome, while not admissible to show a rape actually occurred, was admissible to "disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths. . . ." (*Id.* at pp. 247-248, citations omitted.)

"In a series of decisions the Courts of Appeal have extended to [the context of child sexual abuse accommodation syndrome] both the rule and the exception of *People v. Bledsoe,* [citation]; i.e., expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v.*

---

[1]Unless otherwise indicated, all further statutory references are to the Evidence Code.

*McAlpin* (1991) 53 Cal.3d 1289, 1300 [283 Cal.Rptr. 382, 812 P.2d 563] (*McAlpin*).)

In *McAlpin*, our Supreme Court also extended the *Bledsoe* principles, in that case to expert testimony that "dealt with the failure not of the child victim, but of the child's parent, to report the molestation." (*McAlpin, supra,* 53 Cal.3d at p. 1301.) The *McAlpin* decision reasons that "[m]ost jurors, fortunately, have been spared the experience of being the parent of a sexually molested child. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial. It is reasonable to conclude that on the basis of their intuition alone many jurors would tend to believe that a parent of a molested child, naturally concerned for the welfare of the child and of other children, would promptly report the crime to the authorities, just as a parent would be likely to do if the child complained of someone who had beaten him or stolen his pocket money. Yet here the prosecution had evidence to the contrary— . . . expert opinion . . . that in fact it is not at all unusual for a parent to refrain from reporting a known child molestation, for a number of reasons. Such evidence would therefore 'assist the trier of fact' [citation] by giving the jurors information they needed to objectively evaluate [the mother's] credibility." (*Id.* at p. 1302, fn. omitted.)

Ms. Allard-Wills's testimony served a function similar to that endorsed in these cases. The jury had to reconcile conflicting stories given by Parker. Consistent with the reasoning of *McAlpin*, "[i]t is reasonable to conclude that on the basis of their intuition alone many jurors would tend . . ." to doubt that Parker would recant a truthful statement in order to testify in an untruthful manner, effectively protecting her abuser. (*McAlpin, supra,* 53 Cal.3d at p. 1302.) However, the prosecution had evidence that "[i]t is very common" for a woman who has decided to reunite with her batterer to recant and falsify information in order to justify her decision to stay with the batterer. Ms. Allard-Wills's testimony was therefore relevant and admissible to explain or offer a motive for Parker's recantation and thereby reconcile inconsistencies in her testimony.

Morgan contends that it was improper to use battered women's syndrome evidence to restore Parker's credibility. According to Morgan, allowing expert testimony for such a purpose permits "an end run around" section 1107 and its prohibition against the admission of such evidence to prove the occurrence of the charged act. A similar argument was made and rejected in *People* v. *Housley* (1992) 6 Cal.App.4th 947 [8 Cal.Rptr.2d 431] (*Housley*). The *Housley* decision addresses the admission of expert testimony on child sexual abuse accommodation syndrome (CSAAS). (*Id.* at pp. 954-957.)

Many Court of Appeal decisions have recognized that CSAAS evidence may not be used to prove the fact of the charged offense. (See *McAlpin, supra,* 53 Cal.3d at p. 1300 [collecting cases].) Thus, even though CSAAS evidence is not subject to section 1107, it is nonetheless subject to a similar, if not identical, prohibition on its use. In fact, in *Housley*, the defendant challenged the admission of CSAAS evidence because he believed the evidence had been used to suggest that a crime had occurred. (*Housley, supra,* 6 Cal.App.4th at p. 954.) The victim in *Housley* recanted the initial description of events that she had given to police officers, social workers and the prosecutor. (*Id.* at p. 951.) The prosecutor offered expert testimony that ". . . it is very common for victims of abuse to recant the story after first making a report because they may not be believed, or may be removed from their home, or may fear the offender will suffer negative consequences from the reported abuse." (*Id.* at p. 952.)

The Court of Appeal acknowledged the relevance of the evidence, explaining that the expert's "testimony was clearly intended to help explain [the victim's] delay in reporting the abuse and her last-minute recantation of the charges." (*Housley, supra,* 6 Cal.App.4th at p. 955.) The expert testified that she had never met the victim and hence the court found it unlikely that the jury would interpret the expert's testimony as a "testimonial to [the victim's] credibility." (*Id.* at pp. 955-956.) The court also noted that cross-examination of the victim by the defense counsel was intended to cast doubt on the truth of the victim's statements made prior to trial. "Under these circumstances the psychological testimony was properly admitted to rehabilitate [the victim's] credibility and to explain the pressures that sometimes cause molestation victims to falsely recant their claims of abuse." (*Id.* at p. 956; see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [249 Cal.Rptr. 886] ["Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings."].)

The reasoning of *Housley, supra,* 6 Cal.App.4th 947 is equally applicable here. Morgan's defense attempted to suggest a number of reasons why Parker did not tell the "true" story when the officers first arrived at her apartment on February 5. One theory was that Parker was suffering a psychotic break on February 5. Morgan used this theory to suggest that Parker's judgment and ability to relate truthfully and correctly were impaired when she first recounted events to the police. The defense advanced this theory during opening statement, closing argument and many times in between. Parker's credibility was clearly a main issue of the trial.

Ms. Allard-Wills's testimony was responsive to the issue of Parker's credibility. We do not find it likely that the jury interpreted that testimony as a testimonial to the truth of Parker's pretrial statements to officers. Ms. Allard-Wills testified about battered women's syndrome in general. She expressed no opinion as to Parker. In fact, there was no suggestion that Ms. Allard-Wills had ever even spoken with Parker or that she knew any of the facts or allegations surrounding this case.

Moreover, the jury was expressly instructed that Ms. Allard-Wills's testimony "[was] not received and must not be considered by [the jury] to prove the occurrence of the act or acts of abuse which form the basis of the crimes charged." The instructions advised the jury that the limited purpose of that evidence was to show (if in fact it succeeded) "that the alleged victim's reactions as demonstrated by the evidence are not inconsistent with her having been physically abused." We therefore conclude that Ms. Allard-Wills's testimony on the subject of battered women's syndrome was relevant and was not used for the purpose prohibited by section 1107.

III. DISPOSITION

We affirm.

Peterson, P. J., and Haning, J., concurred.