Filed 6/7/16  P. v. Crow CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JAMES LEE CROW, <br><br> Defendant and Appellant. | F068987 <br><br> (Fresno Super. Ct. No. F13910098) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jane Cardoza, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant James Lee Crow was convicted of multiple felonies after assaulting and threatening his girlfriend over a two-day period. After he was arrested, he repeatedly called the victim from jail and ordered her to avoid the investigators and not to appear in court, which resulted in five separate convictions for dissuading a witness from prosecuting a crime. He was sentenced to an aggregate third strike term of 175 years to life plus 38 years.

On appeal, defendant argues his five convictions for dissuading a witness from prosecuting a crime in violation of Penal Code[1] section 136.1, subdivision (b)(2) must be reversed because the charges were based on his postarrest jail calls to the victim, and that statute only addresses prearrest behavior. He also contends the court should have stayed the multiple terms imposed for those convictions pursuant to section 654 because he had the same intent and objective when he made each call.

Defendant further argues the court abused its discretion when it permitted the prosecution to introduce the testimony of an expert about intimate partner battering,[2] and argues the expert's testimony was not relevant to any contested issue because the victim never recanted her allegations against him. He also argues the jury was not properly instructed on considering the expert's testimony.

Finally, defendant asserts the court improperly admitted evidence of his prior conviction for a domestic violence-related offense pursuant to Evidence Code section 1109. We modify defendant's sentence and otherwise affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] "Although often referred to as 'battered women's syndrome,' 'intimate partner battering and its effects' is the more accurate and now preferred term. [Citations.]." (*In re Walker* (2007) 147 Cal.App.4th 533, 536, fn. 1; Evid. Code, § 1107, subd. (f).)

2.

# FACTS

In September 2012, defendant and K.S. began a dating relationship. He went to jail for a short period of time, and K.S. put money on his books and supported him. K.S. testified that when defendant was released from custody, defendant had relationships with both K.S. and K.C., a former girlfriend.

As of June 2013, defendant was romantically involved with both K.S. and K.C., and the two women knew about each other. K.S. testified she knew defendant was lying and cheating on her, and "[h]e was always texting or calling [K.C.] when he was with me.…" K.S. frequently saw K.C. arrive at their apartment, and defendant would leave with K.C. and not return until the next day.[3]

K.C. testified she had renewed her relationship with defendant when she visited him in jail in 2012. She testified that after defendant was released from jail, K.S. repeatedly called and sent threatening messages to K.C. about her relationship with defendant. K.C. testified that she listed defendant in her cell phone as "Hater of me," as a reminder that defendant "wasn't with me, and that when he was not with me, he was with her … whatever her name is," referring to K.S. K.C. testified she loved defendant "like crazy" even though he was not nice to her when he was with K.S.

K.C. testified that at some point prior to June 19, 2013, the tires on her car were slashed. K.C. believed either K.S. or defendant did it. K.C. sent defendant a text message and confronted him about the tire slashing incident. K.C. demanded that defendant "[c]all off your bitch" and leave her alone.

---

[3] K.S. is the victim in the charged offenses and testified at trial. K.S. was on felony probation when she testified. K.S. had a prior conviction for felony welfare fraud in 2013 and possession of a deadly weapon, a billy club, in 2012. She was not granted immunity for her testimony.

3.

The charges in this case are based upon K.S.'s testimony that over a two-day period, from June 19 to 20, 2013, defendant beat K.S. as they argued about his relationship with K.C.[4]

**June 19, 2013**

On June 19, 2013, defendant was at K.S.'s apartment. They started arguing because she believed he was texting K.C. again.[5] K.S. testified that "every time I'd go to the restroom or something, he'd take off with [K.C.] and then come back the next day."

The argument began in the apartment's bathroom/vanity area and then moved to the living room. At some point, K.S. testified she was so angry that she picked up the rod from the shower curtain in the bathroom, and she threw it at defendant. It missed him and hit the wall. Defendant got mad and threw the rod at her, and the rod hit her in the back.[6]

K.S. testified that as they argued, defendant hit K.S. on the back of her head "two or three times" with his "bike ring." K.S. started bleeding from the injury. Defendant left the apartment.

Later that same day, defendant returned to K.S.'s apartment. K.S. testified they again argued about his relationship with K.C. K.S. testified she tried to move away from defendant. He got in her way and she pushed him with her hands. K.S. testified defendant punched her in the face. Defendant also placed her in a choke-hold and inflicted bruises on her arms when she tried to break free.

---

[4] K.S. testified that defendant assaulted her several times on June 19 and 20, 2013. She knew which day the incidents happened, but she was not entirely clear about the sequence in which each assault occurred.

[5] K.C. testified that defendant sent her several text messages and repeatedly called her on June 19, 2013.

[6] At trial, K.S. could not recall which day the shower rod incident happened. Officer Severson testified that K.S. reported the shower rod incident happened on June 19, 2013.

**June 20, 2013**

K.S. testified that on June 20, 2013, she was in bed with defendant and realized he was again sending text messages to K.C. K.S. saw his cell phone "light up under the bed, and that's how it all started, and him texting [K.C.] behind my back while he was at the house and just taking off with her without telling me anything."

K.S. testified they again argued about defendant's relationship with K.C. Defendant tried to leave, she pushed him back in the apartment, and "that's when we started hurting each other."

K.S. testified she pushed defendant with her hands. Defendant "started swinging back," and he "hit me a couple of times" on "every part" of her face. Defendant pinned her to the floor and started "socking my face." K.S.'s face hurt so bad "I couldn't even move my face." "All I remember is him hitting me on the ground, hitting me in the eyes, and it was hurting me bad. I was in pain." Defendant "was on top of me punching me on my face, holding me down, wrestling."

K.S. testified defendant pulled a pocket knife with a six-inch blade. He held it to K.S.'s throat, just behind her ear. Defendant told K.S. that he would kill her "if she called the cops or anything" and "if you scream or anything." K.S. testified that whenever defendant became upset, his eyes would get big, and he would be so mad that "[i]t looks like he could kill somebody." K.S. testified defendant looked that way as he held the knife to her throat, and she could "see in his eyes" that he wanted to kill her. K.S. told defendant, " 'Kill me, then,' " and " 'Go ahead and kill me. I'm not going to sit here and hit you like a man. I'm going to fight for my life.' "

The telephone rang and defendant told K.S. to answer it "because if I didn't answer it, they knew something would be wrong." As defendant left the apartment, he told K.S. that "if he goes to jail then I'm done."

5.

**K.S.'s Statements to Officer Severson**

Later on June 20, 2013, K.S.'s aunt called the police and reported the assault, and K.S. went to the hospital that day. Officer Severson met K.S. at the hospital and took photographs of her injuries. K.S. had swelling and discoloration on her face and cheeks, and bruises on her left arm and left chest, as a result of being punched by defendant. She also had bruises on her arms, wrist, and legs from when defendant held her on the floor and hit her. She had another bruise on her back, from being hit with the shower curtain rod. At trial, the prosecution introduced photographs of K.S.'s injuries which had been taken at the hospital.

Officer Severson interviewed K.S., who said she argued with defendant, and it escalated into a physical confrontation. K.S. said defendant placed her in a choke-hold from behind. She tried to grab his arms to pull them away from her neck. Defendant grabbed her arms and inflicted the visible bruises on her arm. K.S. said her bruises and injuries were the result of the entire physical altercation, including being hit with the shower curtain rod and being pushed to the floor.

Officer Severson gave K.S. an emergency protective order (EPO), which prevented defendant from contacting her.

**Defendant's Messages to K.C.**

On or about June 20, 2013, and through June 26, 2013, defendant sent text messages to K.C., which said: "She is in the hospital, and now I'm going to disappear. Remember, I still and always will be in love with you." He also wrote "I took care of it. This won't happen to you anymore," that "[s]he's in the hospital," "I did this for you," and "If you told on me, you're f[**]ked." K.C. testified she believed defendant was referring to K.S., and that he did something because K.C.'s tires had been slashed.

On June 26, 2013, defendant sent a text message to K.C. asking if she had a key to his truck and warning that "the cops will be on the lookout for it at night."

At some point prior to July 8, 2013, defendant was arrested and booked in the jail.

6.

**DEFENDANT'S POSTARREST CONTACTS WITH K.S.**

K.S. testified that while defendant was in jail, she allowed him to repeatedly call her, even though she knew the EPO prohibited such contacts.

Based on the following jail calls, defendant was charged and convicted of five counts of dissuading a witness from prosecuting a crime (counts VII through XI; § 136.1, subd. (b)(2)). The prosecution introduced the recordings and transcripts of the calls, and it was stipulated to the jury that the male voice was defendant and the female voice was K.S.

**Defendant's Call From Jail on July 8, 2013 at 3:25 p.m. (Count VII)**

During this call, K.S. asked defendant when he was going to court. Defendant said he didn't know. K.S. said she could not find out.

Defendant told K.S.: "*Don't go to court. I mean it, do not show. If you love me and you want me to be free, do not show up ever to court.*" (Italics added.) K.S. asked why. Defendant said, "Because if you do, I'm goin' to jail," and "if they get you there one time they can use that and say that you showed up to court saying that it was true everything happened. This guy next to me is fighting 25 to life over the same shit right now." K.S. replied, "[B]ut the thing switched. Remember the proposition thing?" Defendant explained, "No no no, I'm talkin' about you," and "about the domestic violence case." Defendant again told K.S.: "Don't show up. Do not come," and "I mean hide from 'em."

K.S. agreed to say that she lied. Defendant told her not to even show up, and he heard about another guy in jail who walked out because "they tried to find her," and "she wouldn't come." Defendant said, "Don't show up." K.S. said she was not going to, and asked if the police could break down her door. Defendant said they were not allowed to, and again told her not to open the door for the police.

Defendant promised not to leave K.S. "if you do what you're supposed to do." Defendant declared his love for K.S., that he needed her, he threw everyone else away for

7.

her, he wanted to be her man, and he wanted to marry her. He asked her to put money on his books, find out about his bail, and call his attorney.

The call ended cordially as defendant and K.S. said they loved each other. Defendant asked if he could call K.S. later that night. K.S. said that was okay and asked him to call before he went to bed.

### Defendant's Call From Jail on July 8, 2013 at 5:47 p.m. (Count VIII)

Defendant called K.S. and told her to hide from the police and not to appear in court. "I don't want you to come to the court dates at all until I tell you it's okay to come…. *Promise me you'll hide from 'em* [the police]…. Just don't answer the door if they come, okay?" (Italics added.) K.S. said yes, that she had already promised him earlier.

The call again ended with defendant and K.S. saying that they loved each other. Defendant asked if he could call her again that night, and K.S. said she would be there.

### Defendant's Call From Jail on July 8, 2013 at 8:22 p.m. (Count IX)

Defendant called K.S., said he was her husband and she was his "wife now," and told her "[j]ust don't show up for anything" and "[d]on't answer the door for any officers and don't show up." K.S. was afraid they would break in. Defendant said that was illegal, and not to worry about it, "[j]ust do as I ask as my wife" and "*don't show up for anything*." (Italics added.)

K.S. said she wanted to be in court to show that she was there for him. Defendant said she could come to court only if "this case is dismissed," then she could come for the other case.

As with their prior calls, defendant and K.S. again promised they loved each other, and K.S. told defendant to call her the next day.

### Defendant's Call From Jail on July 9, 2013 at 3:59 p.m. (Count X)

Defendant called K.S. and said he just got back from court, and it was postponed until July 26, 2013. Defendant again said, "Babe you cannot show up no matter what,"

8.

and "I mean it babe. I put my life on it," and "they're gonna put my life away if you do I swear to [G]od I'm not kidding you…."

K.S. said she wanted to visit him in jail if she could not go to court. Defendant said that was okay, "but don't go to court." Defendant asked K.S. if she was being faithful to him. K.S. said she was always faithful to him. Defendant said he never cheated on her even though she thought so. Defendant said he was not with "her" when he was with K.S. They started arguing about their relationship, and K.S. became angry and said she was going to call "her" (presumably K.C.) and say defendant loved K.S. more than K.C.

Defendant asked K.S. why she still had the restraining order (apparently referring to the EPO). K.S. said she kept it in case anything came up. Defendant told her to get rid of it because he did not want her to use it against him. They again argued about whether they were being faithful to each other. Defendant insisted he loved K.S., apologized if he "did anything wrong to you," and repeatedly told her to put money on his books.

As the call ended, defendant and K.S. again promised they loved each other.

## Defendant's Call From Jail on July 11, 2013 at 6:19 p.m. (Count XI)

Defendant told K.S. he was scared because he did not know what she was going to do to him. They argued about their relationship, and K.S. was upset that "she" was on his visiting list, referring to someone other than herself (presumably K.C.). Defendant said he couldn't help if "she comes down here," again referring to someone other than K.S.

They continued to argue about a woman other than K.S. K.S. was angry that defendant had called "her." Defendant said he just needed "her" to do something. K.S. said he should watch it because "you're gonna lose me and you're gonna … regret it watch." K.S. said they were "done" because defendant had called "her." K.S. added that she did not "put you in there…. I didn't call the … cops." Defendant told K.S. to stop threatening him, and he wanted to be with a "beautiful woman" and not with a

9.

"gangster." K.S. said she wasn't dumb, and she knew he was still with the other woman "when I was with you."

Defendant told K.S. that he loved her and didn't want to argue with her. K.S. said he acted like she wanted defendant "in there." Defendant replied: *"Well then you got to tell. You have to tell 'em I didn't touch you. I did not even touch you."* (Italics added.) K.S. said she told his attorney that her bruises were already there. Defendant continued: "You have to tell 'em I didn't touch you period." Defendant also wanted to know exactly what K.S. told his attorney. K.S. said she told them that "I get bruised very easily."

K.S. reminded defendant that he told her to hide out and not to talk to anyone, and she was "doin' what you asked me to do." Defendant said, "I didn't ask you to hide out. I didn't tell you to," and "Stop sayin' that over the phone."

Defendant told K.S. that he heard about three guys who went to court and "got fifteen, seventeen, and nineteen years for a female saying that they dissuaded a witness for the guy saying to tell them not to say anything." K.S. asked if their witness went forward. Defendant said the police reports were enough to get them.

K.S. asked defendant what they should do. Defendant said he couldn't tell her what to do anymore, and all he could do was "give you some advice and that's you know, *do what you're doin' and stay to it.* I can't tell you anymore I can't dissuade witnesses that's what they call it, dissuading a witness…." (Italics added.)

K.S. told defendant she wanted him home. Defendant said he wanted to go home, "but they think that I hit, that, girl, and they think that I hit her and beat her," and "they think I hit her with a knife and a stick," and "some chick" said he had threatened her. Defendant said he loved her, and again told her to put money on his books.[7]

---

[7] At trial, K.S. testified that they used a code in some of their letters when they discussed the case. The same type of situation appears to have occurred during this call.

Defendant promised to call K.S. again that night, and they said they loved each other.

**Defendant's Call From Jail on July 11, 2013 at 1:02 p.m. (Not a Charged Offense)**

The prosecution also introduced evidence of additional calls which defendant placed from jail to K.S., which were not charged offenses.[8]

During the July 11, 2013, call, defendant said he was disappointed in K.S. and her family because they made statements against him. Defendant was angry that he was still in custody. K.S. said she knew it was her fault.

**Defendant's Call From Jail on July 11, 2013 at 6:19 p.m. (Not a Charged Offense)**

Defendant and K.S. argued about their relationship, with references to K.C., and defendant insisted he had not done anything wrong to K.S. K.S. again was angry because "she" was on defendant's visiting list, referring to another woman. Defendant said he couldn't help it if "she" came to visit him. Defendant admitted he had called "her" about his truck key.[9] K.S. said he was lying, and he couldn't stay away from "her" for even a few days.

Defendant accused K.S. of putting him in jail. K.S. said she did not call the police. Defendant said he did not want to be with a "gangster," but he wanted a lady, referring to K.S. K.S. said she was not a thug. K.S. said she was going to hang up. Defendant said she knew she loved him.

---

[8] As we will discuss in issue III, *post*, the nature of these calls were relevant to the court's decision to permit the prosecution's expert to testify about intimate partner battering.

[9] As noted above, on June 26, 2013, defendant sent a text message to K.C., asking if she had a key to his truck and warning that "the cops will be on the lookout for it at night."

11.

**Defendant's Call From Jail on July 12, 2013 at 7:05 p.m. (Not a Charged Offense)**

K.S. told defendant that she talked to his attorney, and they couldn't get him out of jail because he "ran" when he was on bail last time.[10]  K.S. said the attorney told her that she had to go to court, and "for me to go in there and just say that I hit you[] first.  It was a mutual thing," or "they're gonna give you lots of time."  K.S. said the attorney told her that if she ran away to hide, "it's gonna make your … situation worse," and the judge would rely on the police report and defendant would get a lot of time.  It was better to "go in there and just say it was mutual.  I hit you[] first.  So I don't know if I can get time for this.  I don't know.  It's alright if I do."

Defendant told K.S. not to show up to court anyway, and "just go forward with what I told you to do."  K.S. was upset because when she met with the attorney, he thought she was K.C.  Defendant told K.S. he loved her, neither of them were going to prison, and "[t]his is all a big misunderstanding.  Nobody saw anything.  Nobody was there.  It never happened.  *You hit yourself.  I saw you hit yourself.*"  (Italics added.)[11]

They argued about defendant's relationship with the other woman.  K.S. said she didn't call the police or put him in jail.  Defendant said she made a statement to the police, saying that he hit her with a curtain rod, he slapped her, and he punched her in the face.  K.S. said her aunt talked, and K.S. never said anything.

**K.S.'s Testimony About Defendant's Postarrest Contacts**

At trial, K.S. was asked about these jail calls from defendant.  K.S. testified she accepted about 30 telephone calls from defendant when he was in jail, even though she knew the calls were prohibited by the EPO.  Defendant told her not to come to court because he would go to prison if she did.  Defendant also told her that if she had to

---

[10] It was stipulated that the references to defendant's attorney during these jail calls were not to the lawyer who represented defendant at trial.

[11] The defense theory at trial was that K.S. inflicted the physical injuries on herself to set up defendant because she was angry about K.C.

12.

appear, "just to say that I lied about everything so he wouldn't go to prison," and to claim that she inflicted the injuries to herself.

K.S. admitted there were numerous times when she failed to appear in court in this case because she felt bad and still loved him. K.S. testified as a result of defendant's admonitions, she cut her wrists because defendant said that "he was going to kill himself if he went to prison, and that he was blaming me for being in jail."

**Letters Between Defendant and K.S.**

K.S. testified that in addition to the jail calls, they exchanged numerous letters after defendant was arrested, even though she knew they were prohibited by the EPO. Sometimes defendant and K.S. wrote the letters as if they were being sent to K.S.'s sister, to avoid problems with the EPO. Some of the letters were read into evidence.

In a letter dated, July 18, 2013, K.S. accused defendant of talking to K.C. while he was in jail. K.S. told defendant that she wanted to be on his jail visit list, and demanded that defendant remove K.C. from the list.

On July 26, 2013, K.S. again wrote to defendant in jail, and addressed the letter to "Mr. Liar." She accused defendant of not being truthful, honest, or faithful to her because he was still talking to K.C. She also wrote a poem to him, entitled "I hate you," with the closing line, "What I hate the most is the fact that I don't hate you."

On July 27, 2013, K.S. sent defendant another letter and again accused him of seeing and talking to K.C.

On September 4, 2013, K.S. wrote to defendant that she was not cheating on him, and said she had tried to hurt herself because she could not live without him.

**Defendant's Call From Jail on September 12, 2013 at 10:59 a.m. (Not a Charged Offense)**

During the final jail call recording introduced by the prosecution, defendant told K.S. that he was going to prison for 14 years, and "[t]hey said it doesn't even matter if you come or not" to court.

13.

"They said they got the phone calls when I first called you and said that I threatened you over the phone not to come, not to show up and that I told you that I'd kill you if I went to prison."

Defendant told K.S. that he hoped she was happy about everything. K.S. insisted she did not do anything to hurt him. Defendant cursed her, and said her jealousy did it to him because "I wouldn't be sittin' here if it wasn't for your … little report." K.S. cried and told defendant that he should do what he felt he had to do.

## EXPERT TESTIMONY

It was stipulated that defendant had a prior conviction related to domestic violence in 2008, for misdemeanor corporal punishment or injury to a spouse or cohabitant resulting in a traumatic condition (§ 273.5), and K.S. was not the victim.

Bob Meade (Meade), a marriage and family therapist, testified for the prosecution as an expert witness on domestic violence and the intimate partner battering syndrome. He explained the "cycle of violence" and the honeymoon, tension, and explosion/abuse stages. The honeymoon phase was "really a façade. It's not genuine, but it can be where he is saying, 'I'm sorry. I really love you,' and she's trying to make everything work out." The tension phase starts when the abuser "is getting moody again, he's getting upset, and she tries everything she can, trying to get him to calm down and make things work, and then that moves into what we call an explosion phase, or an abuse phase, where there is physical violence, verbal abuse … which then eventually deescalates and swings back into a new honeymoon phase, and that cycle continues."

Meade testified that the relationship becomes more violent as the cycle repeats itself more quickly. The syndrome is about "power and control," where abusers "mentally and verbally break down the psyche of the victim," and cause a "brain-washing state of mind" where victims "do things that they wouldn't normally do or think of doing." The syndrome is sometimes characterized by "learned helplessness," where a victim feels there is no use trying to get help because "[h]e's going to win anyway. He always comes out on top anyway. He has the power. He has the control. There is

14.

nothing I can do about it." The victim is often told the abuse was her fault and begins to believe there will be consequences if she testifies against the abuser. It is not unusual for the victim to give money to the abuser or visit him in jail.

Meade did not testify about defendant, K.S., or K.C. He did not know the facts of the instant case, and was testifying to generally "educate the jury about domestic violence."

## Convictions and Sentence

After a jury trial, defendant was convicted as charged of the following offenses, based on the assaults and injuries inflicted on June 19 and 20, 2013: count I, assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)); count II, misdemeanor battery on a spouse or cohabitant (§ 243, subd. (e)(1)); count III, assault with a deadly weapon, a knife (§ 245, subd. (a)(1)); count IV, criminal threats (§ 422), with personal use of a deadly or dangerous weapon, a knife (§ 12022, subd. (b)(1)); count V, dissuading a witness by force or threat, based on the threat he made to K.S. if she reported the assaults, as he left on June 20, 2013 (§ 136.1, subd. (c)(1)); and count VI, misdemeanor battery on a spouse or cohabitant.

As explained above, defendant was also charged and convicted of five counts of dissuading a witness from prosecuting a crime based on his separate jail calls to K.S. (§ 136.1, subd. (b)(2), committed on July 8, 2013 (counts VII through IX); July 9, 2013 (count X); and July 11, 2013 (count XI).

Defendant admitted five prior strike convictions; one prior serious felony enhancement, and two prior prison term enhancements.

On February 25, 2014, defendant was sentenced to the third strike term of 175 years to life plus 38 years as follows. As to count III, assault with a deadly weapon, defendant was sentenced to 25 years to life, plus five years for the prior serious felony enhancement, plus one year for the prior prison term enhancement.

Defendant was sentenced to consecutive terms of 25 years to life, plus five years for the prior serious felony enhancement, as to each of the following counts: count V, dissuading a witness by force or threat (§ 136.1, subd. (c)(1)); and counts VII, VIII, IX, X, and XI, dissuading a witness from prosecuting a crime (§ 136.1, subd. (b)(2)).

He was sentenced to a consecutive term of two years (double one-third the midterm), for count I, assault by means of force likely to produce great bodily injury. The court ordered time served for misdemeanor counts II and VI, stayed the term imposed for count IV, and dismissed the second prior prison term enhancement.

## DISCUSSION

### I.      Defendant's Convictions for Violating Section 136.1, Subdivision (b)(2)

As explained above, defendant was charged and convicted in counts VII through XI of dissuading a witness from prosecuting a crime, in violation of section 136.1, subdivision (b)(2), based on five separate jail calls to K.S.

Defendant contends these convictions must be reversed for insufficient evidence as a matter of law. In making this argument, defendant concedes he "certainly did something wrong in making [the] post arrest phone calls" to K.S. However, he asserts that he was prosecuted under the wrong statute because section 136.1, subdivision (b)(2) only applies to a suspect's "prearrest" efforts to dissuade a witness from testifying. Defendant thus concludes that his convictions in counts VII through XI must be reversed because they were based on conduct which occurred after he was arrested, when he called K.S. from jail.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light

16.

most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.] Issues of witness credibility are for the jury." (*People v. Boyer* (2006) 38 Cal.4th 412, 479–480.)

## A. Section 136.1

Section 136.1 is one of several statutes contained within part I, title 7, chapter 6 of the Penal Code, "which establishes a detailed and comprehensive statutory scheme for penalizing the falsification of evidence and efforts to bribe, influence, intimidate or threaten witnesses." (*People v. Fernandez* (2003) 106 Cal.App.4th 943, 948 (*Fernandez*).)

Section 136.1, subdivision (a) provides in relevant part:

"[A]ny person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison:  [¶]  (1) Knowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.  [¶]  (2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law."

Section 136.1, subdivision (b) provides in relevant part:

"[E]very person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶]  (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge.  [¶] (2) *Causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof.*  [¶] (3) Arresting or causing or seeking the arrest of any person in connection with that victimization."  (Italics added)

## B. Interpretation of Section 136.1

Defendant's claim that he was erroneously prosecuted under section 136.1, subdivision (b)(2) is based a series of cases which address the statutes that prohibit the

falsification of evidence and efforts to bribe, influence, intimidate or threaten witnesses: *People v. Hallock* (1989) 208 Cal.App.3d 595 (*Hallock*), *People v. Womack* (1995) 40 Cal.App.4th 926 (*Womack*), and *Fernandez*, *supra*, 106 Cal.App.4th 943.

As we will explain, these cases do not support defendant's interpretation of section 136.1, subdivision (b)(2). Instead, these cases have limited the dissuading statutes according to their specific language, to avoid overlap in their application.

In *Womack*, the defendant was convicted of attempted murder and attempting to induce a witness to give false or withhold true testimony under section 137, subdivision (b). *Womack* held that the intent to kill for attempted murder was inconsistent with the intent required under section 137, subdivision (b), to induce the witness to give false testimony or withhold true testimony. (*Womack*, *supra*, 40 Cal.App.4th at pp. 931–932.) "The entire sense of … section 137 is that testimony will be given, but the perpetrator will attempt to *influence* the testimony given," whereas section 136.1 and other dissuading statutes "clearly contemplate that the perpetrator will prevent or dissuade a prospective witness from *giving* testimony, or will attempt to do so. Preventing or dissuading a witness from testifying altogether is incompatible with influencing or shaping the testimony the witness gives." (*Id.* at pp. 930–931, italics in original.)

*Womack* concluded that interpreting "inducing a witness to withhold true testimony" (§ 137) as including "preventing or dissuading a witness from testifying" (§§ 136.1, 138), would render sections 136.1 and 138 "redundant." (*Womack*, *supra*, 40 Cal.App.4th at p. 931.) "If preventing or dissuading a witness from testifying is included in inducing a witness to withhold true testimony,… then sections 136.1 and 138 are surplusage. Adopting this construction of section 137 would be repugnant to all rules of statutory construction. [Citation.]" (*Ibid*.)

In *Hallock*, the defendant broke into the victim's home and attempted to rape her. After a struggle, the victim broke free and ran away. As she fled, the defendant threatened to blow up her house " 'if you tell anybody anything that happened tonight

18.

here ….' " (*Hallock*, *supra*, 208 Cal.App.3d at p. 598.)  The defendant was charged under section 136.1, subdivision (b)(1), with dissuading a victim from reporting the victimization, but the jury was mistakenly instructed on the terms of section 136.1, subdivision (a), which penalizes dissuading or attempting to dissuade a victim from attending or testifying at trial.  (*Id*. at p. 607.)  The People argued there was no error because the defendant's threat against the victim was so broad the jury could have found a crime under either subdivision (a) or (b).  (*Ibid*.)  *Hallock* reversed the conviction and held the evidence supported only a finding that the defendant's threat, made at the time of the offense, was aimed at preventing the victim from reporting the offense, not at dissuading the victim from testifying at a future trial.  (*Id*. at pp. 607, 610.)

In *Fernandez,* the defendant drove the witness to the preliminary hearing and begged him not to tell the truth.  He was convicted of violating section 136.1, subdivision (b)(1), attempting to prevent or dissuade another person from making a *report* to law enforcement.  (*Fernandez*, *supra*, 106 Cal.App.4th at p. 946.)  *Fernandez* reversed the conviction and held that section 136.1, subdivision (b)(1), which penalizes attempts to prevent or dissuade a victim or witness from " '[m]aking any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge,' " does not include an attempt to influence a victim's testimony at a preliminary hearing.  (*Id*. at pp. 947–949.)

*Fernandez* explained the statutes in chapter 6 each targets particular kinds of conduct, such as threats of violence by a defendant after conviction or in retaliation for cooperation with law enforcement (§§ 139, 140), efforts to prevent a victim or witness from appearing in court (§§ 136.1, subds. (a)(1), (2), & (c), 138, subd. (a)), and attempts to influence the content of testimony (§ 137, subds. (a)–(c)).  (*Fernandez*, *supra*, 106 Cal.App.4th at pp. 949–950.)

*Fernandez* concluded that "when the Legislature intends to penalize an effort to influence or prevent *testimony,* or an effort to prevent the defendant from appearing in

court, it does so explicitly. Section 136.1, subdivision (b)(1) makes no reference to testimony or courtroom appearances. [¶] … [¶] … Section 136.1, subdivision (b)(1) should not be construed to punish efforts to prevent or influence testimony when it does not do so expressly, and there are other statutes within the same scheme that cover such conduct." (*Fernandez, supra*, 106 Cal.App.4th at p. 949–950, italics in original.)

In reaching this conclusion about under section 136.1, *subdivision (b)(1)*, *Fernandez* relied on *Hallock* and made this broad statement about *subdivision (b):*

> "We agree with *Hallock's* conclusion that section 136.1, subdivision (b) punishes a defendant's *pre-arrest efforts* to prevent a crime from being reported to the authorities. Under the current statutory scheme, such conduct is not the equivalent of an effort to prevent a witness from giving testimony after a criminal proceeding has been commenced. [Defendant's] attempt to prevent or influence [the victim's] testimony simply is not substantial evidence of conduct proscribed by section 136.1, subdivision (b)(1), although it would have been punishable as an attempt to influence a witness's testimony under section 137, subdivision (c), had it been charged under that section." (*Fernandez, supra*, 106 Cal.App.4th at p. 950, italics added.)

## C. Analysis

Defendant asserts that *Womack* and *Fernandez*, which relied on *Hallock*, demonstrate that he was wrongly convicted of violating section 136.1, subdivision (b)(2) based on his postarrest jail calls. As we have explained, however, these cases compared other dissuading statutes and did not squarely address the statute under which defendant was convicted in this case.

We believe the issue was resolved in *People v. Velazquez* (2011) 201 Cal.App.4th 219 (*Velazquez*), where the defendant was convicted of multiple counts of criminal threats, and "dissuading a witness from prosecuting a crime" in violation of section 136.1, subdivision (b)(2). (*Velazquez, supra*, at p. 223.) *Velazquez* reversed some of the convictions because of procedural errors in the trial court's denial of a motion for acquittal. (*Id*. at pp. 230–232.)

As relevant to this issue, *Velazquez* affirmed the defendant's conviction under section 136.1, subdivision (b)(2), based on his postarrest attempts to persuade the victim to drop the charges.  In doing so, *Velazquez* rejected the same argument which defendant raises in this case – that *Fernandez* held both clauses of section 136.1, subdivision (b) only apply to prearrest conduct.  (*Velazquez*, *supra*, 201 Cal.App.4th at pp. 232–233.)

> "Defendant's reliance on *People v. Fernandez* is misplaced.  The issue in that case was whether subdivision (b)(1) of section 136.1 applied to an attempt to influence a witness' testimony, not, as in this case, whether subdivision (b)(2) applies to an attempt to influence a victim to drop the charges against a perpetrator.  To the extent the court in *Fernandez* intended to include subdivision (b)(2) in its statement that subdivision (b) applies only to prearrest attempts to dissuade the reporting of a crime, the statement is dictum, with which we respectfully disagree.

> "Unlike subdivision (b)(1), which makes it a crime to attempt to dissuade a crime victim from '[m]aking any report of that victimization to any peace officer ... or to any judge,' subdivision (b)(2) makes it a crime to attempt to dissuade a victim or witness from '[c]ausing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof.'  Subdivision (b)(2) clearly encompasses more than prearrest efforts to dissuade, inasmuch as it includes attempts to dissuade a victim from causing a complaint or information to be prosecuted or assisting in that prosecution.  The evidence in this case shows that defendant threatened [the victim] in an attempt to persuade her to drop the charges against his fellow gang members.  This is sufficient evidence to support a conviction under section 136.1, subdivision (b)(2), for attempting to dissuade a victim from causing a complaint or information to be prosecuted.  Therefore the judgment as to count 2 is affirmed." (*Ibid*., fn. omitted.)

We agree with the analysis in *Velazquez*, that section 136.1, subdivision (b)(2), by its own terms, is not limited to prearrest conduct.  The latter portion of section 136.1, subdivision (b)(2) has no logical limitation to prearrest conduct, since it prohibits dissuading someone from "assisting in the prosecution" of the defendant, an act which necessarily follows an arrest.

21.

Defendant acknowledges *Velazquez*, but argues it was wrongly decided, and that *Fernandez*, *Hallock*, and *Womack* are more persuasive. However, *Womack* distinguished the reach of section 137 from that of section 136.1, subdivision (a), concerning efforts to prevent a witness from attending or testifying at a trial or other proceeding. While *Hallock* and *Fernandez* viewed subdivision (b) as applying to prearrest attempts to influence, the subdivision at issue was (b)(1), the subject of which is "[m]aking any report." Subdivision (b)(2), by contrast, covers "[c]ausing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, *and assisting in the prosecution thereof*." (§ 136.1, subd. (b)(2).), italics added.) This latter portion of subdivision (b)(2) has no logical limitation to a prearrest timeframe since "assisting in the prosecution" necessarily follows an arrest.

In addition, *Fernandez* relied on dictum in *Hallock* about section 136.1, subdivision (b), which did not address the issue raised in this case. While *Fernandez* found some overlap between section 136.1, subdivision (b) and section 137, the purview of these statutes is not identical, and defendant was charged and convicted of conduct which was specifically prohibited in section 136.1, subdivision (b)(2), dissuading a witness from "prosecuting a crime," as he repeatedly urged K.S. not to talk to the prosecution and not to come to court.

We conclude that defendant was properly charged and convicted of violating section 136.1, subdivision (b)(2), based on his postarrest telephone calls to K.S.

## II.    <u>Consecutive Sentences</u>

Defendant next contends that the court improperly imposed multiple sentences for his five convictions of violating section 136.1, subdivision (b)(2), in counts VII through XI, and that one or more of the terms should have been stayed under section 654 because he had the single intent and objective of dissuading K.S. from testifying when he made the multiple telephone calls.

## A. **Background**

Defendant was charged and convicted of violating section 136.1, subdivision (b)(2) based on the telephone calls he placed from jail to K.S. as follows: count VII, July 8, 2013 at 3:25 p.m.; count VIII, July 8, 2013 at 5:47 p.m.; count IX, July 8, 2013 at 8:22 p.m.; and count XI, July 9, 2013 at 3:59 p.m.

We have already recounted the contents of these calls in the factual statement, *ante*.

At the sentencing hearing, the court imposed consecutive sentences for counts VII through XI, and found each offense occurred on a different occasion than the other crimes, constituted a separate act or threat of violence, defendant had a chance to reflect between each offense, and each offense created a new risk.

> "[T]he phone calls that were made to the victim despite … the telephone program that they have wherein an inmate who's making phone calls is advised that the recordings are … being recorded, despite that, [defendant] made those phone calls in a clear attempt to dissuade the witness in this case. … [A] total disregard for the law, a total disregard for the Court's orders. And given the record before the Court, it merits the sentencing imposed by the Court."

## B. **Analysis**

A criminal defendant can suffer multiple convictions for a single criminal act or series of related criminal acts. However, he cannot be punished more than once for the same criminal or for a series of criminal acts committed "incident to one objective." (§ 954; § 654; *Neal v. State of California* (1960) 55 Cal.2d 11, 19; *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1517.) Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"'The proscription against double punishment in section 654 is applicable where there is a course of conduct which ... comprises an indivisible transaction punishable under more than one statute ....  The divisibility of a course of conduct depends upon the intent and objective of the actor, and *if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one*.'  [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced.  [Citation.]' [Citation.]"  (*People v. Coleman* (1989) 48 Cal.3d 112, 162, italics added.)  "The failure of defendant to object on this basis in the trial court does not forfeit the issue on appeal. [Citation.]"  (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.)

Defendant asserts that he should not have been sentenced to five consecutive terms for his violations of section 136.1, subdivision (b)(2) because all of his jail calls to K.S. had the single intent and objective of convincing her not to cooperate with the prosecution of the charges filed against him.  We agree.  Defendant was properly convicted of multiple counts of dissuading based on the jail telephone calls.  Given the nature and circumstances of each call, however, he committed these multiple offenses while embarked on a single-minded campaign to convince K.S. not to cooperate with the prosecution of the charges against him in any way.  He sought to wear down any resistance she might have had by assuring her of his love, and that they would be together upon his release.  While the calls were separated by time and day, there was still one intent and objective, as he continued his entreaties to K.S. as his first court appearance approached.  He only abandoned his purpose when, according to the final call in September 2013, he returned from court and said, "[I]t doesn't even matter if you come or not" because "they got the phone calls when I first called you and said that I threatened you over the phone not to come, not to show up and that I told you that I'd kill you if I

24.

went to prison." In contrast to the other calls, that final conversation ended in cursing and crying, and K.S. ultimately appeared to testify against him.

We thus conclude that the evidence shows defendant had one intent and objective when he placed the five postarrest jail calls. His third strike sentence of 25 years to life for count VII, plus five years for the prior serious felony enhancement, was appropriate; but the third strike sentences of 25 years to life imposed for counts VIII through XI, and the accompanying five-year prior serious felony enhancements for those counts, should have been stayed pursuant to section 654.[12]

## III.    Expert testimony on Intimate Partner Battering

Defendant next argues the court improperly permitted the prosecution to introduce the testimony of Bob Meade on intimate partner battering. Defendant asserts Meade's testimony was not relevant to any issue because K.S. never retracted her original statement to the police about what defendant did to her, K.S.'s trial testimony was consistent with her statement to the police, and she did not minimize defendant's actions or claim she inflicted the injuries upon herself.

### A.  Background

During trial, the prosecution moved to introduce the testimony of Meade, a marriage and family therapist, on the effects of intimate partner battery syndrome. The prosecutor argued Meade's testimony was relevant and probative as an explanation for K.S.'s conduct and reactions to defendant's numerous telephone calls, where she was willing to lie or hide from the police. Meade was only going to offer general testimony and not address the facts of this case.

---

[12] Our conclusion as to counts VII through XI does not affect defendant's conviction or sentence in count V for dissuading a witness by force or threat (§ 136.1, subd. (c)(1)), which was based on the threat he made after he finished assaulting K.S. and left her apartment on June 20, 2013, and told K.S. that she would be "done" if he went to jail.

Defense counsel argued the foundation had not been established for the expert because K.S.'s trial testimony did not support the argument that she was trying to minimize what happened, take the blame, or recant the allegations. Defense counsel argued K.S.'s trial testimony for the prosecution showed she was "a very strong personality, a strong-willed woman."

The court held the prosecution could use Meade's expert testimony to "disabuse the jurors of commonly-held misperceptions concerning domestic violence…. [I]t does appear to the court that it would be helpful to this jury to understand domestic violence and the syndrome and to further understand the cycle of violence."

There were no further objections to Meade's testimony.

## B. Admission of Expert Testimony

Expert testimony on intimate partner battering is statutorily authorized under Evidence Code section 1107, which states in pertinent part: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).)

Such testimony is also admissible under Evidence Code section 801, subdivision (a), which permits expert testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact…." (See *People v. Brown* (2004) 33 Cal.4th 892, 905 (*Brown*).)

Expert testimony on intimate partner battering "is relevant to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand. [Citation.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 293.) It is not unusual to find intimate partner battering victims recanting

prior statements, minimizing the alleged abuse, refusing to testify, and/or returning to be with the abuser/defendant. (*People v. Morgan* (1997) 58 Cal.App.4th 1210, 1215 (*Morgan*).) Expert testimony on this topic assists the trier of fact in explaining the "victim's counterintuitive state of mind and reactions," often in the context of testifying against their abusers. (*Brown, supra,* 33 Cal.4th at p. 913; *Morgan*, *supra*, 58 Cal.App.4th 1210.)

"The relevance of this evidence is based on the possibility that the jurors will doubt that a witness who claims to have been abused has indeed acted in the manner to which he or she testified, and therefore the jurors might unjustifiably develop a negative view of the witness's credibility. [Citation.] Even if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled by [intimate partner battering] evidence. Thus, there is no need for the defendant first to bring up the potential inconsistency between a witness's actions and his or her testimony before the prosecution is entitled to attempt to dispel any misperceptions the jurors may hold by introducing [intimate partner battering] evidence, provided, of course, that there is an adequate foundation for a finding that the witness has been affected by [intimate partner battering]. [Citation.]" (*People v. Riggs*, *supra*, 44 Cal.4th at p. 293.)

Expert testimony on intimate partner battering is still subject to exclusion pursuant to Evidence Code section 352. (*People v. Riggs*, *supra*, 44 Cal.4th at p. 290.) In addition, the expert may only testify about the syndrome in general and not express an opinion about the complaining witness in the case. (*Morgan*, *supra*, 58 Cal.App.4th at p. 1217.) The court's admission of the evidence is reviewed for an abuse of discretion. (*People v. Riggs*, *supra*, 44 Cal.4th at p. 290.)

C.  **Analysis**

The court did not abuse its discretion when it permitted Meade to testify.  Meade did not address any aspect of K.S.'s allegations against defendant or offer an opinion on her credibility.  Instead, he provided general testimony about the cycle of violence and the behaviors of domestic violence victims.  Meade's testimony was relevant to explain K.S.'s behavior in repeatedly allowing defendant to violate the EPO that she had requested at the hospital, and her willingness to continue communicating with defendant after he was arrested and held in jail.

As set forth in the factual summary, *ante*, the numerous calls and letters that K.S. and defendant exchanged after he was arrested for brutally beating her demonstrated this counterintuitive behavior.  Defendant and K.S. declared their love for each other, and defendant instructed her not to cooperate with the prosecution.  K.S. admitted that she failed to appear at several court hearings as a result of his directions and blamed herself for defendant's custodial status.  In the absence of the expert testimony, "the jury might have discredited [K.S.'s] testimony based upon a misconception that anyone who was physically … abused … would not have remained in a relationship with her abuser, even when he was incarcerated …." (*People v. Riggs*, *supra*, 44 Cal.4th at pp. 293–294.)

## IV.    CALCRIM No. 850

As to Meade's testimony, the court instructed the jury with CALCRIM No. 850:

> "You have heard testimony from Bob Meade regarding the effect of intimate partner battering.  Bob Meade's testimony about intimate partner battering is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [K.S.'s] conduct was not inconsistent with the conduct of someone who has been abused and in evaluating the believability of her testimony."

Defendant contends this instruction set forth an erroneous legal theory and reduced the prosecution's burden of proof.

First, defendant never objected to the instruction (Eand has forfeited appellate review of this claim. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.) Second, a similar instruction has been approved as properly advising the jury on the limited admissibility of this evidence. (See, e.g., *Morgan*, *supra*, 58 Cal.App.4th at p. 1217; *Brown*, *supra*, 33 Cal.4th at p. 902.)

CALCRIM No. 850 cautioned the jury to use Meade's testimony for the limited purpose of evaluating K.S.'s testimony. It did not suggest K.S. was telling the truth, or that the intimate partner battering had occurred. (See, e.g., *People v. Housley* (1992) 6 Cal.App.4th 947, 959.) The jury also received CALCRIM No. 332, on the consideration of expert witness testimony – that the jury was not required to accept the expert's opinions as true or correct, and the jury had to decide whether the information upon which the expert relied was true and correct, determine the meaning and importance of any opinion, and disregard any opinion that it found unbelievable, unreasonable, or unsupported by the evidence.

CALCRIM No. 850 did not reduce the prosecution's burden of proof or require the jury to assume the battering had occurred. The court separately instructed the jury with CALCRIM No. 220, that the People had the burden of proving appellant's guilt beyond a reasonable doubt.

## V.    Admission of Prior Acts of Domestic Violence

It was stipulated to the jury that defendant had a prior conviction related to domestic violence in 2008, for misdemeanor corporal punishment or injury to a spouse or cohabitant resulting in a traumatic condition (§ 273.5), and K.S. was not the victim.

Defendant concedes that Evidence Code section 1109 provides for the admission of prior acts of domestic violence in a criminal action in which the defendant is accused of an offense involving domestic violence, and that it is an exception to Evidence Code section 1101's prohibition against the introduction of propensity evidence.

29.

Defendant asserts that the admission of propensity evidence violated his constitutional rights to due process and equal protection, but further concedes similar arguments have been repeatedly rejected.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 912–922 (*Falsetta*); *People v. Soto* (1998) 64 Cal.App.4th 966, 983; *People v. Price* (2004) 120 Cal.App.4th 224, 239–240, and cases cited therein.)

Defendant urges this court to reconsider *Falsetta* and the other cases, based on the Ninth Circuit's decision in *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769, which held that an instruction violated due process because it allowed the jury to draw an inference of criminal propensity from evidence that the defendant committed prior narcotics offenses and was possibly involved in a murder.  (*Id*. at pp. 773–777, revd. on other grounds in *Woodford v. Garceau* (2003) 538 U.S. 202.)

To the extent that *Falsetta* and *Garceau v. Woodford* are in conflict, we must follow *Falsetta.*  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 782 [California appellate court is not bound by Ninth Circuit decisions].)  We also note that *Garceau* addressed evidence of prior acts introduced pursuant to Evidence Code section 1101, and not the specific language of Evidence Code section 1109 related to domestic violence cases.  (*Garceau v. Woodford*, *supra*, 275 F.3d at pp. 773–774.)  Moreover, even after *Garceau,* our Supreme Court has expressly reaffirmed *Falsetta's* due process and equal protection analysis.  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1288–1289.)  Finally, a different panel of the Ninth Circuit reached a conclusion contrary to *Garceau*, and upheld a federal rule of evidence that was analogous to Evidence Code section 1109.  (*United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1022, 1031.)

We therefore acknowledge defendant has raised the issue but conclude the admission of propensity evidence pursuant to Evidence Code section 1109 does not violate due process and equal protection.

## **DISPOSITION**

The consecutive third strike terms of 25 years to life imposed for counts VIII, IX, X, and XI, and the accompanying five-year terms for the prior serious felony enhancements are stayed pursuant to Penal Code section 654. Defendant's aggregate sentence is modified to 75 years to life plus 18 years. As modified, the judgment is affirmed in all other respects. The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES, J.